**Clyde R. YAIST, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 214–77.**

United States Claims Court.

June 12, 1989.

Thomas M. Gittings, Washington, D.C., for plaintiff, James D. Murray, Lakeland, Fla., of counsel.

Alan Brenner, Washington, D.C., with whom was Acting Asst. Atty. Gen. Donald Carr, for defendant.

OPINION

FUTEY, Judge.

This action is before the court for a determination of the extent of damages to which plaintiff is entitled, following a decision by the Court of Claims which found that the defendant had effected a taking of plaintiff's property.[1] For the reasons stated in this opinion, the court finds that plaintiff is entitled to compensation in the amount of $9,266.56 plus interest and reimbursement of reasonable expenses, including attorney's fees, under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970.

*Factual Background* [2]

Plaintiff, Clyde R. Yaist, entered into three agreements for deed with Olson Florida Realty Company (Olson Realty), through its agent Webb Realty, between 1966 and 1968, to purchase a total of 60 contiguous acres of real property. The first agreement, dated August 26, 1966, for a 10 acre parcel, the second agreement, dated May 10, 1968, for a 35 acre parcel, and the third agreement, dated July 18, 1968, for a 15 acre parcel.[3] Plaintiff paid in full for these tracts, which cost $1,295.00, $3,555.00 and $1,295.00 respectively, in accordance with the agreements for deed. Additionally, Yaist paid taxes on the subject property through 1974.

1. *Yaist v. United States,* 228 Ct.Cl. 281, 656 F.2d 616 (1981).

2. The Court of Claims previously determined those facts relating to the liability phase of this proceeding, as set forth in *Yaist v. United States,* 228 Ct.Cl. 281, 656 F.2d 616, and the Adoption of the Trial Judge's Findings With Minor Modifications (Ct.Cl. July 29, 1981).

3. Each agreement stated that the deed conveyed an area "comprising [the specified acreage] more or less, and containing an indeterminate amount of land and bay bottom." The majority of the area conveyed by the deeds is submerged lands.

This deeded property encompasses an island,[4] the tip of a piece of land which lies about 300 feet west of the island, and the surrounding area, which is submerged under water. This property lies in the Southeast quarter of Section 19, Township 54 South, Range 31 East, within the boundaries of the Everglades National Park in the 10,000 Islands region of Monroe County, Florida. Section 19 is an unsurveyed area, the majority of which is subject to tidal inundation (*i.e.*, covered and uncovered by water due to the normal daily tides). *Yaist v. United States*, 656 F.2d 616, 228 Ct.Cl. 281, Adoption of Trial Judge's Findings with Minor Modifications, No. 3 (1981). The remaining area is covered with dense vegetation, predominantly mangrove trees. *Id.*

Plaintiff executed a warranty deed to South Polk Development Corporation (South Polk) on June 10, 1968, conveying approximately 9.2 acres of the 35 acre tract contained in the second agreement for deed at a price of $2,000.00. The deed conveyed mostly submerged lands, and the portion of land lying to the west of the island. No part of the island was conveyed through this deed. On January 29, 1971, Yaist executed a warranty deed to Nauti–Buoy, Inc. (Nauti–Buoy), conveying a 25' × 165' strip of the island, 4,125 square feet, (approximately .10 of an acre), from the 15 acre tract contained in the third agreement for deed, at a price of $750.00.

Both Nauti–Buoy and South Polk constructed cabins on the property which they purchased from Yaist. Additionally, plaintiff constructed two fishing cabins on the island. Yaist began construction of the "first cabin" after purchasing the land in August 1966, and continued making improvements through 1969. Construction of

the "second cabin" was begun in 1971 and completed sometime between the end of 1972 and early part of 1973.

In 1970 Congress authorized funds for the purchase or condemnation of the remaining privately owned property within the boundaries of the Everglades National Park. Act of Sept. 26, 1970, Pub.L. No. 91–428, 84 Stat. 885 (1970) (amending 16 U.S.C. § 410 (1982)).[5] In 1970 the United States Department of Interior, National Park Service (NPS), began negotiations with Olson Realty for the purchase of property within the borders of the park. By warranty deed dated April 28, 1971, Olson Realty purported to convey 1,186.25 acres of land within the Everglades National Park to the United States, through the NPS, for a price of $118,625.00 ($100 per acre). That acreage included the land sold to Yaist by Olson Realty through the second and third agreements for deed, but not the property conveyed in the first agreement for deed. Yaist did not become aware of the conflicting claim to the property described in the second and third agreements for deed until receipt of a courtesy copy of a letter from the Monroe County tax assessor, dated October 28, 1971, noting that Olson Realty had sold the same property to defendant and plaintiff.[6]

Plaintiff received letters from the NPS dated November 22, 1971 and May 10, 1972, stating that the NPS was planning to acquire plaintiff's property, but did not identify the specific property. On August 15, 1975, the United States filed a condemnation action in the United States District Court for the Southern District of Florida seeking to condemn the 10 acre tract, the subject of the first agreement for deed, which was not conveyed by Olson Realty to the United States. *United States v. 10.00 Acres of Land*, No. 75–1688 (S.D.Fla., Au-

---

**4.** Defendant refers to the area at issue as a "forty acre tract" or "stand of mangroves" claiming that the agreements for deed convey only submerged lands. As discussed *infra*, contrary to defendant's assertions, the court finds that the agreements for deed conveyed title to the island, which is not submerged under tidal water.

**5.** The Secretary of the Interior was originally directed to investigate the desirability and prac-

ticality of establishing a National Park in the Everglades pursuant to an Act of March 1, 1929, ch. 446, 45 Stat. 1443 (1929).

**6.** The conveyance of the subject property to both defendant and plaintiff used the same legal description to identify the property. On November 5, 1973, Olson Realty sent a letter to plaintiff admitting error in selling the same property to Yaist, and later to the NPS.

gust 15, 1975). This case was tried before a jury which returned a verdict in the amount of $3,250.00 on June 8, 1976. On May 13, 1976, the court entered an order of reimbursement in that amount. *United States v. 10.00 Acres of Land,* No. 75–1688 (S.D.Fla., May 13, 1976). Plaintiff appealed to the Fifth Circuit which consolidated this action with 243 other cases involving the condemnation of property within the boundaries of the Everglades National Park. *United States v. 10.00 Acres of Land,* No. 75–1688 (S.D.Fla., July 1, 1976). The United States Court of Appeals for the Fifth Circuit subsequently vacated the decision of the district court and remanded for further proceedings. *United States v. 320.00 Acres of Land,* 605 F.2d 762 (5th Cir.1979). The case was subsequently retried by the district court in 1981.

After the 1981 trial, compensation for the taking was determined by a United States Land Commission. Yaist and the defendant stipulated that the 10 acre parcel "wherever located [is] valued as if the tract were prime waterfront land." *United States v. 320.00 Acres of Land,* No. 75–1467 (S.D.Fla., Agreed Order, October 15, 1981). Additionally, the parties stipulated that the government would compensate plaintiff for the second cabin built by Yaist "without regard to whether the [second] cabin is located on the lands condemned...." *See Yaist v. United States,* No. 214–77 (Cl.Ct., Stipulation, March 14, 1983). According to the above agreed stipulations, it was determined that plaintiff was entitled to $20,000.00 for the 10 acre parcel and $7,800.00 for the second cabin as just compensation. *United States v. 320.-00 Acres of Land,* No. 75–1467 (S.D.Fla., Agreed Order, October 15, 1981). Consequently, neither the second cabin, nor the 10 acre parcel condemned by the United States, is at issue in the present action.

On April 19, 1977, during the pendency of the condemnation action, plaintiff filed a complaint in the Court of Claims alleging that the United States affected a taking of plaintiff's 50 acres through inverse condemnation without just compensation, in violation of the Fifth Amendment. The complaint requests damages in the amount of $350,000.00 for the taking of plaintiff's property plus interest, costs and attorney's fees, or in the alternative, that the United States convey the subject property to plaintiff by warranty deed, and ratify and confirm the property interests of South Polk and Nauti–Buoy.

On May 16, 1978, plaintiff moved to sever the issues of liability and damages pursuant to Rule 131(c)(1) of the Court of Claims, now 42(c) of the Rules of the United States Claims Court. By order dated May 31, 1978, this motion was allowed, conditioned on "plaintiff's waiver of interest subsequent to date of entry of final judgment on liability." *Yaist v. United States,* No. 214–77, (Trial Division Ct.Cl., Order, May 31, 1978).

Trial on the issue of liability was held before Judge Browne of the trial division of the Court of Claims on October 10 through 12, 1978. In the liability phase, defendant contended that; (1) there was no taking; (2) plaintiff lacks a compensable interest in the property, because the United States was a bona fide purchaser for value without notice of plaintiff's claim; and (3) plaintiff lacks a compensable interest in the property because it is entirely submerged land.

On February 15, 1980, Judge Browne issued 61 findings of fact and an opinion holding that Yaist was the equitable owner of the subject property, entitling him just compensation. *Yaist v. United States,* No. 214–77 (Trial Division Ct.Cl. February 15, 1980). The amount of recovery was reserved for further proceedings under Court of Claims Rule 131(c).

The government filed its "Exceptions to the Opinion, Findings of Fact and Conclusions of the Trial Judge," on May 29, 1980, pursuant to Rule 143 of the Court of Claims. A three judge panel of the appellate division of the Court of Claims, consisting of Judges Davis, Friedman and Smith, heard oral argument on this matter on March 10, 1980.

Judge Davis delivered the opinion of the court on July 29, 1981, holding that the United States was not a bona fide purchas-

er without notice of the second and third agreements for deed, and the land claimed by plaintiff had been inversely condemned.[7] *Yaist v. United States*, 228 Ct.Cl. 281, 656 F.2d 616. The court concluded, *"as a matter of law plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined under Court of Claims Rule 131(c)." Yaist v. United States*, 228 Ct.Cl. at 299, 656 F.2d at 628 (emphasis added). The appellate division also approved the findings of Judge Browne with minor modifications. *See Yaist v. United States*, 228 Ct.Cl. at 283, n. 1, 656 F.2d at 619 n. 1. Additionally, the panel held that Yaist has no compensable interest in the parcels that were conveyed to South Polk and Nauti–Buoy, therefore, those lands, approximately 9.3 acres, are not at issue in this case. On September 11, 1981, defendant filed a "Motion for Rehearing En Banc," which was denied on November 6, 1981.

Accordingly, this case was remanded to the trial division of the Court of Claims for a determination as to the "date of taking, the identification of the precise property taken, and the amount of compensation." *Yaist v. United States*, 228 Ct.Cl. at 298, 656 F.2d at 628. On October 1, 1982, pursuant to the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25 (1982), this case was transferred to the United States Claims Court. *Yaist v. United States*, 2 Cl.Ct. 349 n. 1 (1983). On plaintiff's motion for partial summary judgment, Judge Seto of the Claims Court determined the date of taking to be April 29, 1971 (*i.e.*, the date of recordation of the deed from Olson Realty to the United States). *Yaist v. United States*, 2 Cl.Ct. at 350.[8] Trial on damages was held on May 20 through May 24, 1985, and September 9, 10, 12 and 13, 1985.[9]

This case was assigned to the present judge on August 24, 1987. On January 15, 1988, the parties filed a joint status report which, *inter alia*, requested that the case be decided on the record already before the court. In light of the extensive history of the action, and the voluminous record, closing arguments were scheduled for May 26,

---

**7.** In that decision the court determined as a threshold issue that the government had the requisite intent to acquire the subject property, thus the Court of Claims had jurisdiction under 28 U.S.C. § 1491 (1976) (amended Supp. III 1979). Consequently, the action was not precluded by the Quiet Title Act, 28 U.S.C. § 2409a(a) (1976), which would require that the action be brought in the United States District Court for the Southern District of Florida. Additionally, it was determined that the court lacked jurisdiction over plaintiff's claim against Olson Realty which was brought in as a third-party defendant under section 14(b) of the Contract Settlement Act of 1944, 41 U.S.C. § 114(b) (1976).

The question of whether Yaist was the owner of the property turned on the recordation-notice law of Florida. The court held that under Florida law, the agreements for deed between plaintiff and Olson Realty created an equitable conversion which vested plaintiff with equitable title. Further, it was determined that the government was on constructive notice of all items correctly recorded between the time of the government's title search in December of 1970, and closing of the purchase on April 28, 1971. The court found that if a proper search had been made, the defendant would have discovered, in ordinary course, the agreement for deed for the 15 acres. Thus the government was on constructive notice of the 15 acres, and should have made further inquiry, as would a reasonably prudent buyer, and in so doing would have discovered the prior sales to plaintiff. Therefore the government was held to have had "implied actual notice" of the sale of the 50 acres to Yaist. Accordingly, the government was not a bona fide purchaser without notice, since it did not make further inquiry, and Yaist was found to be entitled to just compensation for the taking.

**8.** On January 13, 1984, Judge Seto ruled on defendant's "Motion to Compel Answers to Interrogatories and Production of Documents" holding, *inter alia*, that the determination of the Court of Claims in the liability phase regarding plaintiff's ownership of the property, was not res judicata on the Claims Court in the accounting phase. *Yaist v. United States*, 4 Cl.Ct. 271 (1984).

**9.** During trial on May 23, 1985, defendant moved to strike the testimony of Edwin R. Brownell, a surveyor called by plaintiff, on the ground that plaintiff failed to disclose the substance of Brownell's testimony in violation to the pre-trial order and the discovery rules. The court denied the motion to strike, but granted defendant leave to call additional witnesses at a further trial session to cure any prejudice created by plaintiff's failure to disclose Brownell's testimony in advance of trial. (Transcript at 1500–1501).

**252**

1988, to allow the parties to summarize the issues for the court. This proceeding was postponed until November 29, 1988, due to the illness of plaintiff's attorney.

As of the issuance of this opinion, plaintiff has not received any compensation for the land in question, or first cabin, from the government, Olson Realty, or its agent, Webb Realty.

## Discussion

The questions left for disposition in this action are the identification of the property taken, and the amount of compensation due. *See Yaist v. United States,* 228 Ct.Cl. at 298, 656 F.2d at 628. Of the three parcels conveyed to plaintiff by Olson Realty, only the property conveyed through the second and third agreements for deed, less the acreage conveyed to South Polk and Nauti–Buoy and the land obtained by the United States through the condemnation proceeding, is presently at issue.

## Location of Land

■ The Court of Claims remanded this case with instructions to identify the "precise property taken." [10] *Yaist v. United States,* 228 Ct.Cl. at 298, 656 F.2d at 628. The defendant now contends, in this, the accounting phase of the trial, that the property description contained in Yaist's second and third agreements for deed do not place the island within the area conveyed. Defendant asserts that the maps offered by plaintiff to determine the location of the island, plaintiff's exhibits 0–45, a map derived from a compilation of United States Army aerial photographs, assembled by the United States Coast and Geodetic Survey with lines drawn in by Olson Realty's sales

agent to represent the location of the tracts, and 0–46, a copy of a State of Florida Department of Transportation map, should not be employed because they are inaccurate.[11] The government contends that the United States Geological Survey (USGS) maps, defendant's exhibits 34A–34D, and the National Park Service (NPS) map, defendant's exhibit 24, should properly be used to determine the location of the land which the second and third agreements for deed describe. These maps place the island west of the deed description, thus the area which the agreements for deed describe would be entirely submerged under water, not the island claimed by plaintiff. Consequently, plaintiff would have no ownership in the island. Additionally, as discussed *infra*, plaintiff would not have any interest in the area submerged under water which the deeds describe.

The problem surrounding the determination of the location of the island as described by the agreement for deed, stems from the fact that Section 19, in which the island lies, is unsurveyed territory. Although the location of the subject property would ordinarily be established by matching the legal description contained in the agreements for deed with the mapped out subdivided parts of the section, no survey of the area has established these points. The parties agree, that in the absence of a ground survey, the only way to determine the subdivided parts of Section 19 is by projecting lines from the nearest surveyed points into the unsurveyed area.[12] The location of the subdivided parts on the NPS map, the USGS map, and plaintiff's maps are based on projected lines from established points. The parties produced extensive evidence at trial as to the accuracy of

10. The identification of this property, as mandated by the Court of Claims, should be determined through basic principles of interpretation of a written deed. Therefore, a determination of "which maps ought properly to be used in locating plaintiff's property," *Yaist v. United States,* 228 Ct.Cl. at 291, 656 F.2d at 623, is not essential to identify the property.

11. Plaintiff relies mainly on plaintiff's exhibits 0–45 and 0–46. (Plaintiff's Amended Brief to the Trial Judge, at 26.) Additionally, plaintiff offers other maps for the purpose of determin-

ing the location of the land. These maps also show the island as being within the deed description.

12. To produce a ground survey of Section 19 would be extremely expensive and would probably violate environmental restrictions which prohibit the cutting down of mangrove trees, which would be necessary to create lines of sight essential to preparing a ground survey. (Transcript of Oral Argument at 52, November 29, 1988).

the projected lines. The maps upon which plaintiff relies show the location of the island as being encompassed by the deed description. The USGS and NPS maps place the island outside the bounds of the description contained in the agreements for deed, at two completely different locations.

Plaintiff argues that the court should establish the location of the subject property in accordance with plaintiff's maps, because those maps, not the government's, correctly project the lines of Section 19. Yaist contends that he relied on the map derived from the Army aerial photographs and the Florida Transportation map, plaintiff's exhibits 0–45 and 0–46, when he purchased the land. Additionally, plaintiff avers that the defendant is estopped from using the USGS maps because they were not produced at the first trial, and the government represented to the plaintiff and the court, until just prior to the second trial in 1985, that they would rely only on the NPS map. *See* (Plaintiff's Amended Brief to Trial Judge, at 36). In the alternative, plaintiff contends that even if his maps are found to be incorrect, the court should reform the second and third agreements for deed to reflect the correct location of the land.

The question of which maps are correct need not be determined. The court finds, under principles of contract interpretation, that the agreements for deed conveyed a property interest in the island to Yaist.[13] Although the location of land conveyed through a deed is typically determined by the deed description, the interpretation of a written instrument is a question of law, which is to be determined by the court. *See Jamsar, Inc. v. United States,* 194 Ct.Cl. 819, 823, 442 F.2d 930, 932 (1971); *National Rural Util. Coop. Fin. Corp. v. United States,* 14 Cl.Ct. 130, 136 (1988) *aff'd,* 867 F.2d 1393 (Fed.Cir.1989).

The interpretation of a deed is governed by the law of the state where the land is situated, which in this case, is Florida. *See* 26 C.J.S. Deeds § 80. As the 5th Circuit stated in *Winchester v. Wells,* 265 F.2d 405, 407 (5th Cir.1959), "[i]t is the intent of the parties that is the primary consideration in the construction of a deed. 7 Fla. Laws & Practice 433, Deeds §§ 23, 24; 10 Fla.Jur. 124, Deeds § 110. This salutary rule is binding upon us in the construction of a deed to real property in Florida." Additionally, it is a basic principle of contract interpretation that an instrument "must be construed so as to effectuate the spirit and purpose of the agreement." *See Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979).

The intent of the parties at the time of the execution of the agreements for deed, is clear. There is abundant evidence that Olson Realty intended to sell the island to plaintiff, and plaintiff intended to buy enough property so as to control the entire island. (Transcript at 1515). The parties believed that the agreements for deed correctly set forth the legal description of the tracts, and Olson Realty specifically told Yaist that it owned the island and intended to convey its interest in that property. *Id.* Therefore, in accordance with the law governing the interpretation of these agreements for deed, the court must construe these documents as having the effect of conveying such property as Olson Realty could legally convey.

Furthermore, it would be impractical to find plaintiff not in possession of the land as a result of the deed description improperly identifying the island. Such a holding would bring into question the validity of ownership of lands in areas where no surveys have been produced, thus creating uncertainty of ownership and the possibility of substantial litigation. Additionally,

---

13. Even if it were found that either the USGS or NPS map should be used to locate the land, the court would reform the agreements for deed so as to reflect the proper location as shown by the map. Reformation is available as a remedy when the contracting parties have made a mutual mistake of fact. *National Presto Indus. Inc. v.*

*United States,* 167 Ct.Cl. 749, 338 F.2d 99 (1964), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). An incorrect deed description would constitute a mutual mistake for which this court could provide reformation as a remedy.

this would deter potential buyers from purchasing land in unsurveyed areas.

The fact that the deed may not accurately reflect the location of the island does not work an injustice, especially in this instance, since, as the Court of Claims found, the United States was on notice as to Yaist's ownership of the land. Moreover, the United States relied on the exact same deed description when it attempted to purchase the island from Olson Realty.

This holding will not interfere with the property interests of other private landowners, because the island in which plaintiff has an interest is surrounded by water. Additionally, since the United States has acquired the land within the boundaries of the Everglades National Park, this decision will not create a legacy of problems relating to the validity of land ownership in the region, nor will it affect future land transfers.

### Sovereign Lands

On March 3, 1845, upon admission to the Union, the State of Florida obtained title to all lands under navigable waters, including those lands covered and uncovered by the daily ebb and flow of the tide. *United States v. 2,899.17 Acres of Land,* 269 F.Supp. 903, 906 (M.D.Fla.1967). Title to these areas is held by the State in trust for the people of Florida. *Odom v. Deltona Corp.,* 341 So.2d 977, 980 (Fla.1977). Thus, these lands are sovereign lands.

In 1855, the Internal Improvement Fund of the State of Florida (Fund) was created to hold in trust those swamp and overflowed lands granted to Florida by the Swamp Lands Act of 1850. *Trustees Internal Improvement Fund v. Root,* 63 Fla. 666, 58 So. 371 (1912). The Fund, however, had no authority over any lands lying under tidal waters, (*i.e.,* lands regularly inundated by the daily ebb and flow of the tide) until 1917. *Hayes v. Bowman,* 91 So.2d 795, 800 (Fla.1957); *Florida Bd. etc. v. Wakulla Silver Springs,* 362 So.2d 706, 709 (Fla.Dist.Ct.App.1978). *cert. denied,* 368 So.2d 1366 (Fla.1979). In 1959 the Fund conveyed to the United States, by quitclaim deed, those lands within the boundaries of the Everglades National Park in which the State of Florida held title.

■ Plaintiff's chain of title to the subject property traces back to a conveyance from the Fund to Charles H. Scott by deed dated June 20, 1901. Defendant argues that plaintiff does not have title to the property at issue because the conveyance to Scott in 1901 is void due to the lack of the Fund's authority to convey sovereign property. Plaintiff acknowledges that the Fund did not have authority to convey sovereign lands in 1901, but contends that since the issue of defective chain of title was not raised by the defendant during the liability phase, that issue is res judicata, or alternatively defendant is estopped from raising the issue. However, the Court of Claims specifically left for the accounting phase the question of whether the property at issue is submerged, and if plaintiff could have an ownership interest in submerged lands. *Yaist v. United States,* 228 Ct.Cl. at 290, 656 F.2d at 623. Therefore, defendant is neither estopped from raising this issue, nor is this issue res judicata.

■ Plaintiff additionally argues that he has an ownership interest in the subject property, notwithstanding the fact that his title traces back to the 1901 conveyance, since (1) the Fund intended to convey all lands within the described boundaries in the 1901 deed, including submerged land, and since the conveyance was without reservation of public rights in the waters, it should be deemed to include any sovereign land; (2) an unconditional conveyance of sovereign land, without reservation, is itself a finding that the area conveyed is not sovereign property, and plaintiff is not on notice of the potentially sovereign nature of the lands; (3) the Florida Marketable Record Title Act, Chapter 712, Florida Statutes, acts to vest title in plaintiff to those sovereign lands within the conveyed area; and (4) the United States is estopped from claiming title to the land since plaintiff and his predecessors-in-title had the right to assume the Fund acted lawfully when making the conveyance.

Plaintiff briefed and argued the present case prior to the opinion by the Florida Supreme Court in *Coastal Petroleum Co. v. American Cyanamid Co.*, 492 So.2d 339 (Fla.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987). That decision is dispositive of all of the above claims. In *Coastal Petroleum*, the court held that the Fund had no authority to convey title to sovereign lands prior to 1917; a conveyance by the Fund without reservation does not act to divest the State of Florida of sovereign lands; a conveyance of sovereign lands by the Fund does not in any way presume that the land conveyed is not sovereign lands; sovereign lands cannot be conveyed without clear intent; Chapter 712 of the Florida Marketable Record Title Act is inapplicable to sovereign lands which lie below the ordinary high water mark, and; the Fund is not estopped from claiming title to sovereign land conveyed prior to 1917 even though it conveyed such land. Accordingly, plaintiff can have no property interest in any property which is found to lie below the mean high water mark of the daily tides, since the Fund had no authority to convey such lands prior to 1917.

■ Defendant asserts that the United States owns the property to which plaintiff claims title by virtue of a 1959 quitclaim deed from the Fund to the United States. This deed purports to convey all lands to which the Fund held title in 1959. Plaintiff asserts that this deed is recorded outside of plaintiff's chain of title, therefore, plaintiff is without notice of the interest of the United States and takes free of any claims of the United States. The 1959 deed, however, does not affect plaintiff's ownership interest in the land at issue. A quitclaim deed only conveys that land in which the grantor has an interest. Since the Fund had authority to convey non-sovereign lands prior to 1917, the 1901 conveyance was valid as to all non-sovereign lands. Thus, the Fund could not convey these non-sovereign lands to the United States in 1959 because title to this property had been previously conveyed through the 1901 deed.

Defendant argues that all, or a substantial portion, of the property conveyed, including the island, is sovereign property because it lies below the mean high water mark of the daily tides. Therefore, in accord with the decision in *Coastal Petroleum*, plaintiff could not have a property interest in any area subject to tidal inundation conveyed through the second and third agreements for deed. Plaintiff asserts that the island is not inundated by the normal tides, thus it is not sovereign property, and the 1901 conveyance is valid as to the lands lying above the mean high tide.

Since the Court of Claims has already held that the United States has effected a taking of plaintiff's property, *Yaist v. United States*, 228 Ct.Cl. 281, 656 F.2d 616, the government has the burden to prove, as an affirmative defense, that the island is sovereign property. At trial defendant introduced no evidence of measurements or tests to indicate that the island is inundated by the tides. The defendant relies on the testimony of Robert Gibbs to prove the island is sovereign property.

Gibbs, a park ranger, testified as a fact witness that he had been to the island 30 to 40 times in 1982 supervising the removal of the second cabin and cleaning the immediate vicinity. (Transcript at 1802, 1811). However, he only travelled into the interior of the island on two of these occasions for approximately four to five hours. The farthest he walked from the cabin was about 300 feet. Gibbs was also on the interior of the island once, in his efforts to appraise the value of plaintiff's second cabin for the condemnation trial. During that visit Gibbs made a single traverse of a 50 foot radius around the second cabin. (Transcript at 1817).

Gibbs testified that the waters of Huston Bay, in which the island is located, are tidal (*i.e.*, rise and fall with the tides), and that the average change from high to low tide takes six to six and one-half hours. (Transcript at 1794). Thus during his two visits to the interior of the island, while removing the second cabin, he was on the island almost long enough to observe a complete change of tide (*i.e.*, from low tide to high

tide or from high tide to low tide). However, the change in the water level is minimal since the tide only rises about one to one and one half feet. (Transcript at 1330, 2318).

Gibbs stated that he found beer cans, which were half full of water, in the interior of the island, which he surmised had "floated in." However, he did not testify that he saw the cans, or anything else float onto the island. Gibbs also testified that the highest point of the island which he was able to observe was an area composed of shells on the southwest portion of the island, which on some days, he testified was inundated with water.

Counsel for plaintiff specifically asked Gibbs, "based on your knowledge and observation of the tides in Huston Bay and your observation of the [island] from the exterior and your observation of the stand of mangroves from the interior, do the normal daily high tides inundate that part of the island which you have been able to observe personally from the interior." (Transcript at 1813–14). Gibbs responded "I have seen water on the island, yes." *Id.* However, his answer related only to the portion of the island which he personally observed. Additionally, since the visibility on the island is quite limited due to the dense vegetation, Gibbs could only have been able to view a small part of the land from any location. (Transcript at 1808).

Plaintiff's witnesses, Jonnie Hutchinson and James Franklin Hargaden, both testified that the normal ebb and flow of the tide does not inundate the island. Hutchinson stated that he made at least 30 to 40 trips to the island during all times of the year, usually staying two or three nights at a time. (Transcript at 1310, 1329). Hargaden testified that he normally stayed at the island for a weekend but had stayed as much as ten days at one time. (Transcript at 2320). Hargaden stated that he had walked on the island a dozen or more times during all hours of the day. (Transcript at 2321). He testified that when he was on the island he was walking "on land and on mangrove roots." (Transcript at 2323). Hutchinson and Hargaden have observed the tides change numerous times and both specifically stated that the island does not become inundated with water due to the normal tides of Huston Bay. Yaist also testified that the island lies above the mean high tide level. (Transcript at 133–34).

Plaintiff's exhibits V–1, V–2, V–14, V–15, V–16, and defendant's exhibit 29, pages 5, 6 and 7, which are photographs of the island, support plaintiff's contention that the island is not sovereign property. Thus, the court finds, from these exhibits, and the testimony adduced at trial, that the defendant has not met its burden of showing that the island is inundated by the ebb and flow of the tide. Therefore, the island is found to be nonsovereign property, and no defect exists in plaintiff's chain of title, as alleged by the defendant, due to the inability of the Fund to convey lands below the mean high tide prior to 1917. Accordingly, plaintiff is entitled to just compensation for the amount of acreage of the island that is not sovereign land in which he has an interest. Yaist, however, has no interest in, and is not entitled to compensation for, those lands subject to tidal inundation, since the Fund had no authority to convey this property in 1901.

The island comprises approximately 11 acres.[14] Plaintiff's witness, Charles D'Agostino, estimated that of the 10 acre tract acquired by the United States through the condemnation action, only 4.5 acres of that area was non-submerged land. Therefore, plaintiff only has an interest in 6.4 acres of the island, taking into account

---

**14.** Charles D'Agostino stated that the island was "approximately 10 acres," (Transcript at 1166), "about 10 or 12 acres" (Transcript at 1167), and "somewhere in the range of 11 to 12 acres." (Transcript at 1169). Additionally plaintiff and defendant agree that the circumference of the island is 2,550 feet. (Plaintiff's Requested Findings of Fact, No. 88, Defendant's Proposed Findings of Fact, No. 150). Using this circumference to determine the area of the island, as calculated with the formula $\pi r^2$ (the formula to find the area of a circle), the area of the island is approximately 11.9 acres. However, such a calculation would be an overestimate since the island is not a perfect circle. Therefore, the court finds the best estimate of the area of the island to be 11 acres.

the land condemned by the United States and the approximately .10 of an acre sold to Nauti–Buoy. Consequently, the court *identifies the precise property taken* as 6.4 acres of the island which lie above the mean high tide. Plaintiff is therefore entitled to just compensation for the taking of 6.4 acres of land.

### Just Compensation

The Fifth Amendment of the United States Constitution provides that private property shall not be taken for public use without just compensation. To provide such compensation, the owner of property which has been taken is entitled to reimbursement for the full monetary equivalent of that property as of the date of the taking. *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973); *Olson v. United States*, 292 U.S. 246, 254–55, 54 S.Ct. 704, 708–09, 78 L.Ed. 1236 (1934). Ideally, the owner should be placed in the same monetary position he would have been without the taking. *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970) (citing *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893)).

No specific formula or rules reflect the appropriate award of compensation for every case. *See United States v. Cors*, 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1949); *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). Both fairness and equity must be considered in awarding compensation, *United States v. Commodities Trading Corp.*, 339 U.S. 121, 124, 70 S.Ct. 547, 549–50, 94 L.Ed. 707 (1950), and a determination must be based on all relevant facts. *Jack Daniel Distillery v. United States*, 180 Ct.Cl. 308, 315–16, 379 F.2d 569, 574 (1967).

The usual measure used to determine just compensation is the fair market value of the property, which is the price that a willing buyer would pay to a willing seller. *United States v. 50 Acres of Land*, 469 U.S. 24, 29, 105 S.Ct. 451, 454, 83 L.Ed.2d 376 (1984). However, this standard is not an "absolute or exclusive method of valuation." *United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 633, 81 S.Ct. 784, 791, 5 L.Ed.2d 838 (1961) (citations omitted). The court may use its judgment in selecting the method to determine fair market value. *United States v. 22.80 Acres of Land*, 839 F.2d 1362, 1365 (9th Cir.1988); *Foster v. United States*, 2 Cl.Ct. 426, 446 (1983). However, this method must reflect economic realities and not be based on speculation or conjecture. *See Olson v. United States*, 292 U.S. 246, 254–55, 54 S.Ct. 704, 708–09, 78 L.Ed. 1236 (1934).

The most frequently employed technique to determine the fair market value is the comparable sales approach, which is generally considered the best indication of the value of the property. *United States v. 179.26 Acres of Land*, 644 F.2d 367, 371 (10th Cir.1981) (citing *United States v. 25.-02 Acres of Land*, 495 F.2d 1398 (10th Cir.1974)); *Cloverport Sand v. United States*, 6 Cl.Ct. 178, 189 (1984). This method utilizes the comparison of sales of other properties which reasonably resemble the subject property with respect to factors such as time, location, size and circumstance. *Foster v. United States*, 2 Cl.Ct. at 447; *see also Snowbank Enterprises, Inc. v. United States*, 6 Cl.Ct. 476, 485 (1984).

Where comparable sales data is lacking, the court will use other evidence, even though somewhat uncertain, as long as it is premised on a reasonably informed basis. *Foster v. United States*, 2 Cl.Ct. at 477 (citing *United States v. Miller*, 317 U.S. 369 at 374–75, 63 S.Ct. 276 at 280, 87 L.Ed. 336). Although such an estimation may call for some conjecture, this will not cause the evaluation to fail. *United States v. 22.80 Acres*, 839 F.2d at 1365 (citing *United States v. Silver Queen Mining Co.*, 285 F.2d 506, 510 (10th Cir.1960)). The claimant, however, bears the burden of establishing the value of the property taken. *See United States ex rel. Tennessee Valley Authority v. Powelson*, 319 U.S. 266, 273,

63 S.Ct. 1047, 1051, 87 L.Ed. 1390 (1943) (citations omitted); *Foster v. United States*, 2 Cl.Ct. at 426.

## Value of the Island

■ Plaintiff and defendant employ the comparable sales method to evaluate the value of the land. Plaintiff contends that the fair market value of the subject land, based on comparable sales, as of the date of taking, April 29, 1971, was $62,000.00, whereas, defendant contends it is $4,000.00.[15]

Yaist's appraisal concludes that the highest and best use of the subject land is for recreational fishing cabin sites. Plaintiff contends that the island could be sold in pieces to 10 to 15 purchasers for $30.00 per front foot to develop sites for fishing cabins. (Transcript at 1260–1261).

■ An owner of property is entitled to have the fair market value of his property determined by reference to its highest and best use. *Olson v. United States*, 292 U.S. at 255, 54 S.Ct. at 708. However, a proposed use requires a showing of reasonable probability that there is a demand for such use. *United States ex rel. Tennessee Valley Authority v. Powelson*, 319 U.S. at 275, 63 S.Ct. at 1052; *McCandless v. United States*, 298 U.S. 342, 345, 56 S.Ct. 764, 765, 80 L.Ed. 1205 (1936); *United States v. 341.-45 Acres of Land*, 633 F.2d 108, 111 (8th Cir.1980), *cert. denied*, 451 U.S. 938, 401 S.Ct. 2017, 68 L.Ed.2d 324 (1981); *Fordyce v. United States*, 7 Cl.Ct. 591, 600 (1985). Just compensation may not be predicated on potential uses which are speculative or conjectural. *United States v. 320.0 Acres of Land*, 605 F.2d 762, 814 (5th Cir.1979); *United States v. 1,291.83 Acres of Land*, 411 F.2d 1081, 1084 (6th Cir.1969).

In support of the contention that the island could be sold in pieces, Yaist offers the fact that he sold a 25′ × 165′ strip of property to Nauti–Buoy for $750.00 ($30.00 per front foot). Plaintiff avers that he could have sold another 25′ parcel of land on the main island to Nauti–Buoy for $750.00 had it not been for the United States acquiring land within the Everglades National Park through condemnation. Plaintiff presents no data, other than the sale to Nauti–Buoy, and the possibility of a second sale. This evidence alone does not sufficiently demonstrate that there was a demand in 1971 for numerous fishing cabins lined up next to each other in that area of the Everglades. It may be that several fishing cabins on the island would dissuade potential purchasers from buying land on the island. Thus plaintiff's appraisal, which rests on the unfounded assumption that a market existed for many fishing cabin sites, cannot withstand judicial scrutiny.

Consequently, plaintiff's 23 "comparable sales" are not indicative of the value of the land since these sales would only be comparable if a market was found to exist for numerous plots of property on the island. Additionally, these sales are not representative of fair market transactions because they involved large marketing expenses, liberal financing terms, and purchasers who were not necessarily knowledgeable about land values in the area. (Transcript at 1685–1686, 1748–1750). Therefore, these sales cannot be considered in determining the fair market value of the 6.4 acres. *Jack Daniel Distillery v. United States*, 180 Ct.Cl. 308, 315–16, 379 F.2d 569, 574 ("fair market value of the property is the price which a willing buyer would pay, in cash, to a willing seller, neither compelled to buy or sell, and both being reasonably informed as to all relevant facts.").

Defendant contends that plaintiff's land is worth $100.00 per acre. (Defendant's exhibit 29). This evaluation is based on the average price of nine sales of property, mostly mangrove, in the vicinity of plaintiff's island, including the two sales from Olson Realty to Yaist for the subject property. The court finds that these transactions appropriately reflect the market value of this property. However, the size of the property in those sales ranges from 2.5

---

15. The defendant reaches a value of $4,074.00 for the property using $100.00 per acre as the value of the land and 40.74 as the acreage for which Yaist claims reimbursement, but rounds this off to $4,000.00. (Defendant's exhibit 29).

acres to 40 acres. Since the subject property is 6.4 acres, only five of these sales, ranging from 2.5 to 10 acres, reasonably resemble the subject property in size for use as comparable sales. *See United States v. Michoud Indus. Facilities*, 322 F.2d 698, 705–06 (5th Cir.1963), *cert. denied*, 377 U.S. 916, 84 S.Ct. 1180, 12 L.Ed.2d 185 (1964); *Snowbank Enterprises, Inc.*, 6 Cl.Ct. at 489. These five properties sold for an average price of $135.40 per acre.

In light of the fact that Yaist himself purchased the land from Olson in 1968, at $101.57 per acre and $86.33 per acre, $135.40 per acre appears to be a fair and correct valuation.[16] Prior arms-length sales of the same land in the relevant time period are the best evidence of the fair market value of that land.[17] *See Berenholz v. United States*, 1 Cl.Ct. 620, 632–33 (1982), *aff'd*, 723 F.2d 68 (Fed.Cir.1983). Consequently, the court determines that the fair market value of plaintiff's 6.4 acres is $866.56.

### Compensation for the First Cabin

Plaintiff seeks compensation for the first cabin and an adjoining dock.[18] The parties stipulated that plaintiff "may claim compensation for the [first] cabin in this case, whether or not the [first] cabin is located on the lands at issue in this case." *Yaist v. United States*, No. 214–77 (March 14, 1983). Thus, the court does not need to determine where the cabin lies on the island in order to award compensation.

 Defendant contends that, pursuant to 33 U.S.C. § 403 (1982), of the Rivers and Harbors Appropriations Act of 1899, the cabin and dock were built in "waters of the United States," thus plaintiff does not have a compensable interest in either. In relevant portion, 33 U.S.C. § 403 provides:

[I]t shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty or other structures in any ... navigable river or other water of the United States ... except on plans recommended by the Chief of [the U.S. Army Corps of] Engineers and authorized by the Secretary of the Army....

"Navigable waters of the United States," as used in this statute extends to areas in tidal waters which are covered by the normal mean high water mark. *Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 750 (9th Cir.1978).

After reviewing plaintiff's exhibits V–14, V–15, V–16 and defendant's exhibit 29, page 7, which are photographs of the first cabin and dock, in addition to the previously mentioned testimony regarding tidal inundation of the island, the court finds that under section 403, the dock was located in navigable waters of the United States.

33 U.S.C. § 406 (1982) provides in part: The removal of any structures or parts of structures erected in violation of the provisions of [section 403] may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

Since Yaist did not have a Corps of Engineers permit for the dock in 1971, and the record is void of evidence of a subsequent application for a permit, the erection of the structure was unlawful and the United States could have sought an injunction for the removal of the dock. *United States v. Joseph G. Moretti, Inc.*, 478 F.2d 418 (5th Cir.1973). "One is not entitled to recover elements of value that the Government ... might have destroyed under exercise of

---

**16.** It is arguable that the value of non-submerged land, as is the 6.4 acres, would be greater than that for an area which the purchaser knows contains submerged lands. However, plaintiff does not raise this argument.

**17.** Both parties agree that sales in the relevant area of the Everglades between 1968 and 1971 do not show any appreciable inflation or defla-

tion in price, therefore sales between that time period do not require any adjustment.

**18.** Yaist also built a boardwalk which ran from the cabin to the dock and a small structure to house a generator, however, plaintiff does not appear to claim compensation for these items. (Plaintiff's exhibit 19–B).

government authority other than power of eminent domain." *Lemmons v. United States,* 204 Ct.Cl. 404, 423, 496 F.2d 864, 875 (1974) (citing *United States v. Fuller,* 409 U.S. 488, 491–92, 494, 93 S.Ct. 801, 805, 35 L.Ed.2d 16 (1973)). Thus, plaintiff has no compensable interest in the dock.

The court is convinced, however, by the same photographs and testimony, that the cabin was not built in navigable waters of the United States. Therefore, plaintiff is entitled to compensation for that structure.

▪ Defendant submitted no appraisal as to the value of the cabin, asserting that it had no compensable value. Plaintiff's appraisal of the cabin uses the cost approach method, also known as the reproduction or replacement cost, to determine the fair market value of the building. The cost approach method determines the value of property by estimating the cost to construct the property at the time of the taking, less depreciation.

Defendant contends that the cabin had no market value on the date of the taking because there is "no evidence that anyone was willing to purchase a fishing cabin for $20/square foot in 1971." (Defendant's Proposed Findings of Fact, No. 43). Additionally, defendant notes that plaintiff produced no evidence as to market sales of other fishing cabins in the Everglades. However, lack of data on market sales does not preclude compensation.

▪ Although comparable sales are usually employed to determine the value of property for just compensation, when the property has no readily discernible market value courts may apply other standards. *United States v. 564.54 Acres,* 441 U.S. 506, 513, 99 S.Ct. 1854, 1858, 60 L.Ed.2d 435 (1979); *United States v. Commodities Trading Corp.,* 339 U.S. at 123, 70 S.Ct. at 549. Reproduction cost is appropriate when there is no ready market with comparable sales. *Pete v. United States,* 209 Ct.Cl. 270, 291, 531 F.2d 1018, 1031 (1976). The guiding principle of just compensation

is that the owner of the property must be made whole. *Olson v. United States,* 292 U.S. at 255, 54 S.Ct. at 708.

Plaintiff's appraiser, Charles D'Agostino, estimated that it would cost $20.00 per square foot to construct a comparable cabin in 1971 with the same materials using hired workers to transport the materials to the island and construct the cabin. (Transcript at 1204). Since the cabin was 28' by 30', 840 square feet, at $20.00 per square foot, the cabin would cost a total of $16,-800.00 to build. *See* (Plaintiff's Requested Findings of Fact, No. 106). D'Agostino concluded that by April 29, 1971, the structure would have been standing for approximately half its physical lifespan due to the quality of the materials used to construct the cabin. Accordingly, he determined there should be a 50% reduction to account for the physical depreciation of the structure. Thus the depreciated value of the cabin would be $8,400.00.[19]

D'Agostino, a member of the American Institute of Real Estate Appraisers, and the Society of Real Estate Appraisers, holding professional designations in both, with 20 years experience, testified as an expert real estate appraiser. Additionally, D'Agostino, a licensed general contractor in the State of Florida, testified as a fact witness as to construction costs of the first cabin. He stated that he had built a number of buildings, mostly for himself, but never a fishing cabin.

D'Agostino viewed the first cabin in 1983 when it was no longer habitable. (Transcript at 1211). He made his appraisal mainly based on a description of the cabin from plaintiff, and photographs of the structure, plaintiff's exhibit V–14 and V–15 (Transcript at 1197–98). Plaintiff asserts that those photographs accurately portray what the cabin looked like on March 27, 1971. (Transcript at 1539–1540).

The cabin consisted of three rooms, a kitchen, a main room with a porch, and a side room. (Transcript at 1526). The

---

**19.** Plaintiff's appraisal of the cabin, (plaintiff's exhibit V–19B) estimates the size of the cabin as 30' by 30', thus valuing the building at $9,000.00 on the date of taking. However, plaintiff testi-fied subsequent to this appraisal that the size of the cabin was 28' by 30', consequently the value would be $8,400.00.

structure was built on wood pilings made from telephone poles. The floor was composed of 2″ by 10″ wood joists with 3″ by 11″ beams between the pilings. The exterior was composed of plywood and pine siding, with 2″ by 6″ studs for the walls and aluminum windows. The roof, the interior of which was insulated, was made of 2″ by 6″ joist with plywood sheathing and roll roofing. The kitchen had wood cabinets, a sink, a propane stove and propane refrigerator. The interior lighting was a combination of gas light and electric.

Plaintiff introduced no records of costs to build the cabin to support his estimation of the value of the cabin. D'Agostino stated that he had figured out the cost of the shell for a number of other cabins, including lumber, walls, posts, windows, etc., and that his appraisal of the first cabin was consistent with his valuation in these other instances. (Transcript at 1202). D'Agostino testified that the construction of the structure took a great deal of effort and time because the island is accessible only by small water craft, thus it required many trips to haul the materials to the island. Plaintiff estimated that it took 8 hours to bring a heavy load of materials by boat to the island from the closest town. (Transcript at 1550).

Yaist testified that in 1971 he repaired the first cabin and added insulation, (Transcript at 1530–1531), putting the cabin in top condition as of April 29, 1971. Defendant contends that this testimony is not credible in light of the fact that Yaist began building a second cabin in 1971; the cabin was last used in 1972, and; defendant's witness, Ralph Miele, testified that the first cabin was in poor condition in 1970. Thus, defendant asserts that D'Agostino's valuation of the cabin does not represent the fair market value because the reduction of 50% for the physical depreciation of the cabin is unreasonably low. Defendant further contends that the cabin suffered functional depreciation, a loss in value caused when a structure is not suitable for its intended use even though the physical condition of the structure is sound (Transcript at 1214–1215), because it was hot, low to the ground, and had poor air circulation. (Transcript at 67–68).

Defendant presents no figures to the court in order to determine a value for physical or functional depreciation. The only estimate before the court as to depreciation is plaintiff's estimate of a 50% reduction for the physical depreciation, which D'Agostino testified could have been "too harsh." (Transcript at 1210). Considering that the photographs taken on September 29, 1983, by the government's appraiser, William Kushman, show the cabin standing, more than 12 years after the date of taking, the court finds the reduction of 50% for the physical depreciation of the cabin appropriate. *See* (Defendant's exhibit 29, at 7). Additionally, although Miele stated that the cabin was in poor condition in 1970, his only opportunity to view the building was when he was flying overhead in an airplane. Furthermore, the court is of the opinion that D'Agostino, an appraiser with 20 years experience, would have made the appropriate reduction for functional depreciation if necessary. Consequently, the court finds no convincing basis on which to further depreciate the value of the cabin.

Although plaintiff's estimate of $20.00 per square foot, with a 50% reduction for physical depreciation of the structure, may not represent the fair market value with complete exactitude, it is sufficiently based on the relevant facts and economic realities existing in that area in 1971 to reflect a reasonably representative figure. Defendant presents no alternative estimate, or means to arrive at an alternative estimate. Accordingly, the court determines that plaintiff is entitled to $8,400.00 as just compensation for the first cabin.

### *Interest*

To afford complete relief in a just compensation action, a property owner is entitled to interest accruing from the date of the taking. *United States v. Thayer–West Point Hotel Co.*, 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947); *Miller v. United States*, 223 Ct.Cl. 352, 399, 620 F.2d 812, 837 (1980). However, pursuant to the

court's order granting plaintiff's motion to sever the action as to liability and damages, plaintiff waived his entitlement to such interest from the time the court determined liability. Judgment as to liability did not become final until May 8, 1982. By order of April 14, 1982, the Court of Claims lifted a suspension of proceedings in this action on May 8, 1982, which was provided for the defendant to petition the United States Supreme Court for certiorari.[20] Consequently, plaintiff is entitled to interest only from April 29, 1971, the date of taking, until May 8, 1982, when the determination of liability became final.

The Claims Court has consistently followed the rule adopted by the Court of Claims in applying a simple interest rate [21] of 7.5 percent per annum for years 1971 to 1975, and 8.5 percent per annum for years 1976 to 1979. *See Georgia Pacific Corp. v. United States*, 226 Ct.Cl. 95, 155, 640 F.2d 328, 366 (1980); *Miller v. United States*, 223 Ct.Cl. at 404–05, 620 F.2d at 840; *Hedstrom Lumber Co. v. United States*, 7 Cl.Ct. 16, 33 (1984); *Cloverport Sand & Gravel Co. v. United States*, 6 Cl.Ct. 178, 203 (1984); *Foster v. United States*, 3 Cl.Ct. 738, 745 (1983); *Jones v. United States*, 3 Cl.Ct. 4, 7 (1983); *Berenholz v. United States*, 1 Cl.Ct. at 620. For the period beginning January 1, 1980, forward, a number of Claims Court decisions have provided simple interest as part of just compensation at the rate established by the Secretary of the Treasury pursuant to an Act of July 1, 1971, Pub.L. No. 92–41, 85 Stat. 97 (1971) (amending the Renegotiation Act of 1951). *See Houser v. United States*, 12 Cl.Ct. 454, 474 (1987); *Henry v. United States*, 8 Cl.Ct. 389, 393 (1985); *Hedstrom Lumber Co. v. United States*, 7 Cl.Ct. at 33; *Cloverport Sand & Gravel Co. v. United States*, 6 Cl.Ct. at 203; *Foster v. United States*, 3 Cl.Ct. at 745; *Jones v. United States*, 3 Cl.Ct. at 7. This rate is utilized in the Contract Disputes Act, 41 U.S.C. § 611 (1982), to compensate successful claimants for the time between the receipt of a claim by the contracting officer and the time when compensation is found to be owing to the contractor. The rates for the years at issue are:

| | |
|---|---|
| January—June 1980 | 12¼ percent |
| July—December 1980 | 10½ percent |
| January—June 1981 | 14⅝ percent |
| July—December 1981 | 14⅞ percent |
| January—June 1982 | 14¾ percent |

This court finds these rates an appropriate measure for awarding interest for the period starting January 1, 1980 in the present action. Thus, from January 1, 1980 to May 8, 1982, plaintiff is entitled to simple interest at the rates outlined in the chart above. Furthermore, plaintiff has "failed to produce any evidence during the trial of the case that an allowance of simple interest would be inadequate to provide just compensation." *Branning v. United States*, 784 F.2d 361, 364 (Fed.Cir.1986).

---

**20.** This order also provided for a 30 day continuance requested by defendant on April 9, 1982.

**21.** The Claims Court has recently held in *ITT Corp. v. United States*, 17 Cl.Ct. 199 (Cl.Ct.1989), that the owner of a patent that was infringed by the government was entitled to compound interest. That decision noted the holding of the Federal Circuit in *Dynamics Corp. of America v. United States*, 766 F.2d 518 (Fed.Cir.1985), which remanded that case to the Claims Court to consider whether compound interest should be allowed to provide the full value of just compensation in the taking of a patent by the United States. However, on remand the case settled prior to issuance of a decision.

In *ITT Corp.*, Judge Nettesheim differentiated between awarding compound interest in eminent domain cases and patent cases, stating:

The reasons to compound interest to achieve the measure of delay compensation in this case are not unique to plaintiff, but are to patent suits against the Government. Eminent domain cases involving takings of land may or may not evolve from takings of land applied in commerce. A patent holder, in contrast, has been given a limited license to monopolize his invention, and the Government's unauthorized use of a patented item frustrates the economic expectations generated by the patent. The taking in an infringement action always impacts on an established or potential commercial exploitation of a patent if the patent holder either has commercialized the patent or is in the business of commercializing a similar product or process as that called for by the patent. This may not be true in takings of land.

*ITT Corp. v. United States*, op. at 240. This court is in agreement with this reasoning, that the factors which militate in favor of awarding compound interest in a patent case are not present in this action.

*Reimbursement of Reasonable Expenses*

The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654 (1982) provides:

> (c) The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

Having rendered judgment for the plaintiff in this takings action brought under 28 U.S.C. § 1491, Yaist is entitled to reimbursement of reasonable expenses specified in the above statute.

### Conclusion

For the reasons stated above, plaintiff is entitled to recover $9,266.56 with simple interest thereon, as just compensation, at a rate of 7.5 percent per annum from April 29, 1971 through December 31, 1975, at 8.5 percent per annum from January 1, 1976 through December 31, 1979, at 12.25 percent per annum from from July 1 through December 31, 1980, at 14.625 percent per annum from January 1, 1981 through June 30, 1981, at 14.875 percent per annum from July 1, 1981 through December 31, 1981, and at 14.75 percent from January 1, 1982 through May 8, 1982.

Entry of judgment will await the determination of reimbursement of plaintiff's reasonable expenses pursuant to the Uniform Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4654 (1982). Plaintiff is directed to file an application for reimbursement of reasonable expenses in accordance with 42 U.S.C. § 4654, and applicable case law, within 60 days. The defendant shall have 30 days to file a response, to which the plaintiff may reply within 14 days.

IT IS SO ORDERED.