James R. SMITH, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–3886L.

United States Court of Federal Claims.

April 28, 1993.

Stephen G. Anderson, Knoxville, TN, for plaintiff.

Alan Brenner, Washington, DC, with whom was Acting Asst. Atty. Gen. Miles E. Flint, Carlton A. Arnold, of counsel, U.S. Army Corp. of Engineers, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

*Introduction*

Plaintiff filed a Fifth Amendment inverse condemnation takings claim in the United States Claims Court[1] on October 29, 1990, seeking $5 million as just compensation for property damage and the cost of preventative measures stemming from the construction of the Smithland Locks and Dam project by the Army Corps of Engineers on the Ohio River. He argues that the construction of said dam altered the flow of the Ohio River, thereby causing erosion and damage to both his Cumberland Island and Smithland properties. Trial was held on April 1 and 2, 1992, in New Albany, Indiana.

We hold that—(i) plaintiff possessed standing to assert damage for a taking with respect to only .01 of an acre of his Smithland property; (ii) plaintiff did not possess standing to bring a claim for preventative measures since we have ascertained that it was the James R. Smith Contracting Company, and not Mr. Smith, which actually incurred the costs of erecting the preventative measures to the Smithland property, and no evidence was adduced demonstrating that Mr. Smith ever reimbursed the company; and, finally, (iii) plaintiff has failed to prove by a preponderance of the evidence that construction of the Smithland Locks and Dam was *the* direct and proximate cause of the erosion which occurred on Mr. Smith's property in Smithland, Kentucky.

---

1. Pursuant to the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), the name—"United States Claims Court"—was changed to—"United States Court of Federal Claims."

*Facts*

The Ohio River has long been used as a means of shipping goods throughout the Midwest. After the Industrial Revolution, the utilization of larger, more powerful ships necessitated the deepening and widening of many of the channels of the Ohio. In the late 1800's, a system of locks and dams were installed which have since been maintained and modernized—(i) to keep up with the increasing size of vessels on the river, and (ii) to ensure that the increased traffic on the Ohio would move up and down the river as quickly as possible. For a more detailed discussion of the damming of the Ohio River, *see Baskett v. United States*, 8 Cl.Ct. 201 (1985).[2]

The portion of the Ohio River that is at the heart of this dispute is located 978.5 miles downstream from Pittsburgh, at the confluence of the Ohio and Cumberland rivers.[3] Prior to 1832, the Ohio River passed between Cumberland Island ("the Island") and the Illinois shore (this channel is commonly referred to as the "Illinois Chute"). A dry bar between the head of the Island and the Kentucky shore blocked the flow of water through this area (known as "the Kentucky Chute"), and only when the elevation of the Ohio exceeded 290 feet above sea level did any water flow through the Kentucky Chute.

In 1833 and 1834, the United States constructed a dike (known as Shreve's Dike) across the low water channel of the Ohio River from Illinois to the head of Cumberland Island. Shreve's Dike was constructed to divert the flow of water to the Kentucky Chute to help remove the sandbars blocking the entrance to the Cumberland River at the port of Smithland, Kentucky, which is located immediately upstream from plaintiff's property.

Shreve's Dike ultimately proved to be ineffective, and consequently the chute at the head of the Cumberland became closed. Moreover, it was found that no water passed through the Kentucky Chute, and a sandbar had formed and occupied the entire chute. In 1848, Shreve's Dike was repaired and the Kentucky Chute was dredged, which created the channelling of water through the chute. These efforts also failed to sustain the flow of water to a sufficient level for navigation in the Kentucky Chute, and high waters in 1867 further developed the sandbar at the head of the chute, obstructing the entire channel.

In 1872, at the urging of William Merril, Major of the Army Corps of Engineers, Shreve's Dike was extended to Cumberland Island to increase the amount of the flow of water into the Kentucky Chute, but these improvements also failed to keep the Kentucky Chute open at low water. At the high river stages, however, the flow of the Ohio passed over Shreve's Dike and returned to its natural course on the Illinois side of Cumberland Island, leaving the Kentucky Chute in relatively still water and subject to the accumulation of sediment. Despite these failings, by 1896, the dam work had achieved a small measure of success. The Kentucky Chute had grown to be 500 feet wide, and it had also become deep enough to be used by steamboats. The Corps of Engineers, however, believed that it would never be able to pass large tows.

The construction and renovation of Shreve's Dike caused some erosion on the left descending bank[4] of the Ohio River at Smithland, Kentucky, including the subject property.[5] Further erosion was caused by the combination of river traffic, current velocities, and eddies formed by the confluence of the Ohio and Cumberland Rivers.

2. The facts in the *Baskett* case are similar to those in the case at bar.

3. *See* Appendix One for a drawing of the subject area.

4. References are made to the "left-descending bank" because as one travels downstream, the bank which is the subject of this dispute is on the left-hand side.

5. The record reflects that there may have been dredging work performed by the government from time to time between 1900–1973 to increase the flow of water through the Kentucky Chute. Tr. 530, 391–392. This may have added to the erosion on plaintiff's bank. However, defendant avers that even if this is true, any claim on this erosion is time-barred by the statute of limitations.

In 1970, the Corps of Engineers began construction of the Smithland Locks and Dam Project.[6] The project's purpose was to return the main navigation channel to the Illinois Chute and to replace existing structures, which had failed to provide for adequate navigation and necessitated continued dredging. The design of the project also involved the removal of Shreve's Dike to ensure the opening of the Illinois Chute.

On June 25, 1974, plaintiff's closely-held corporation, i.e., James R. Smith Contracting Company, Inc.,[7] purchased the subject property (i.e., Smithland) which is situated along the left descending bank of the Ohio River. Mr. Smith has lived at this residence since that time, and in February 1977, plaintiff's wholly-owned company deeded the property to him personally. Said property is bounded by Court Street on the north, Charlotte Street on the east, Level Street on the south, and Front Street (Ohio River) on the west. It extends downstream from Court to Level Streets for 600 feet,[8] and it is approximately 400 feet wide. Shortly after moving into the property, in August or September of 1974, James R. Smith Contracting Company rip-rapped[9] the contiguous west bank to the subject property,[10] when plaintiff noticed erosion

was occurring. The Army Corps of Engineers, just prior thereto, was rip-rapping other City of Smithland's property adjacent and due north of the then corporation's property. This property consisted of a 750–foot section ending at Court Street. The bank on which the rip-rapping was placed by the corporation had previously been Front Street before erosion dismantled it.[11]

The Smithland Locks and Dam Project was put into service in approximately 1981,[12] and contrary to the design of the project, Shreve's Dike was not completely removed. In addition, two large dikes were constructed to divert the dam's discharge away from the locks and toward the Kentucky Chute. These dikes are located downstream from the dam and are angled in the direction of the tip of Cumberland Island.[13] The dikes were constructed to ensure that vessels travelling upstream would be able to pass through the Illinois Chute without having to fight excessively strong currents. The Smithland Locks and Dam project succeeded in channeling the dominant flow of the Ohio River through the Illinois Chute, but a significant amount of water continued to flow through the Kentucky Chute.[14] As a consequence, the

6. Testimony indicates that the project was not substantially commenced until 1973–1974.

7. James R. Smith Contracting Company is a closely-held corporation, whose shares (or at least its voting shares) are held by a single shareholder or a closely-knit group of shareholders. Generally, with respect to such entities, there are no public investors. *Black's Law Dictionary* 308 (5th ed. 1979). In the case of said corporation, Mr. Smith owns 92% of the stock, and the other 8% is divided among his four sons.

8. *See* Appendix Two for a drawing of the subject property.

9. "Rip-rapping" is a term used to describe the process of constructing a barrier to erosion on a river bank. The process generally involves: (1) the grading of the river bank, (2) covering the bank with small rocks (less than 1" in diameter), and (3) laying the graded rip-rap (which consists of large limestone rocks weighing approximately 50–200 lbs.).

10. The banks of the properties of the City of Smithland were similarly rip-rapped in 1973 by the Army Corps of Engineers. This project was

initiated pursuant to an Army Corps of Engineers study which recommended the rip-rapping of the banks because of a "history of bank erosion in the Smithland area ... [which] precede[d] the lock." This area was situated upstream (north) from plaintiff's property.

11. While Mr. Smith testified that he "always assumed" that he owned the bank where the rip-rap was placed, numerous plats established that the City of Smithland rightfully owns Front Street, which has become part of the west bank due to erosion.

12. Plaintiff contends that the construction of the project was completed in 1978.

13. A further addition to the project was the construction of a levee which extended from the dam's esplanade (an area adjacent to the land side of the lock providing land-based access to the lock) to the high ground of the Illinois shore. The effect is to prevent flood waters from flowing onto the Illinois plain.

14. The parties disagree as to how much of the water flow is diverted to the Kentucky Chute. Plaintiff contends that one-third of the flow

head of Cumberland Island has been significantly eroded.[15]

In addition, given the foregoing hydraulic phenomenon through the Kentucky Chute, the bank of the subject property has also experienced *additional* erosion since the construction of the locks and dam,[16] and in response, plaintiff's contracting company attempted to repair the original rip-rap job in 1991.[17] The company placed the rip-rap materials along the top two-thirds of the bank, covering the entire 600 feet of the bank. As water levels receded during the fall of 1991, the company worked on the lower one-third of the bank. First, a toe-trench[18] was cut along the bottom of the bank, which was then filled with rock to provide a stronger foothold to support the rip-rapping on the upper regions of the bank. Lastly, the remainder of the bank was covered with rip-rap.

The rip-rapping repairs ultimately cost plaintiff's closely-held contracting company an alleged $78,306.89, and it is this amount which plaintiff seeks as just compensation for the defendant's actions in addition to its claim for property damage. The record reflects the following breakdown of costs:

| | |
|---|---|
| Direct, out-of-pocket expenses | $62,645.49 |
| Indirect costs | $15,661.40 |
| Total | $78,306.89. |

Tr. 43–44. Mr. Smith estimated that of these costs, approximately $12,000 was spent on labor, $45,000 on the purchase and delivery of the stone,[19] and the remainder on equipment and overhead costs.[20] Tr. 121. The overhead costs consist primarily of administrative costs such as office maintenance and insurance.[21]

Furthermore, the answer raised two affirmative defenses: (1) that plaintiff's

from the Ohio is diverted, while defendant avers that only one-half of the amount plaintiff contends is actually diverted.

15. James Smith Contracting Company acquired Cumberland Island on August 26, 1987. The parties have agreed that Smithland Dam and the remnants of Shreve's Dike have directly and proximately caused the erosion of five acres of land from the head of Cumberland Island. Accordingly, the parties have stipulated to just compensation of $3,000 for the lost acreage. Tr. 43, 47, 345, 346. This is so notwithstanding the fact that no evidence was adduced establishing that the fee thereto has at any time been deeded to plaintiff herein by Jim Smith Contracting Company, Inc. PX 2.

16. Plaintiff maintains that this erosion occurred as a direct and proximate result of the building of the Smithland Locks and Dam. Under this theory, plaintiff argues that the discharge from the dam caused both the amount of water in the Kentucky Chute and the velocity of the flow of water to increase, thereby exacerbating erosion of the bank.

Defendant, however, avers on the other hand that the erosion was caused by water seepage. This phenomenon, known as "piping," has two sources. The upper parts of the river bank become saturated from flood waters or ground water, or the water may enter the bank through a man-made pipe outlet emerging from the face of the bank. When this happens, water goes through the rip-rap and, upon escaping, carries loose soil. As this process repeats itself, the bank is weakened, and ultimately it sloughs down toward the river.

17. It appeared from the record that plaintiff's construction company performed and paid for the rip-rap repairs. This is evident from invoices and receipts which were issued and satisfied through James R. Smith Contracting, Inc. Moreover, it should be noted that the repair job was performed in 1991, while the original complaint was filed on October 29, 1990, and no amendment to the complaint was effected embracing these additional costs.

18. A toe-trench is a ditch approximately five feet deep which is dredged between the rock and water.

19. The stone was purchased from Reed Crushed Stone Company. The invoices from this purchase, however, were not received into evidence. Plaintiff failed to comply with the court's pretrial order, and, upon objection by defendant, withdrew his proffer. Tr. 126–31.

20. The record does not contain a more detailed accounting of the costs of the 1991 rip-rap repair job performed by Smith's contracting company. Documents which contained such information were never formally introduced into evidence. Plaintiff's counsel instead opted to rely on Mr. Smith's testimony as to the breakdown of the costs.

21. The record does not resolve whether any of the $78,306.89 claimed was for lost profits. However, the allowance for administrative overhead on a project performed on plaintiff's personal property may be akin to a claim for lost profits. Moreover, there is absolutely no evidence in the record that establishes whether the plaintiff reimbursed his company for the costs of repairing the rip-rap.

claim was time-barred by the statute of limitations, 28 U.S.C. § 2501; and (2) that the complaint failed to state a claim upon which relief can be granted. However, these positions were tacitly abandoned by defendant inasmuch as appropriate dispositive motions were not filed.

*Contentions*

### 1. Plaintiff

Plaintiff's essential contention is that the construction of the Smithland Locks and Dam system is the direct and proximate cause of the erosive conditions affecting his riverbank property.[22] Further, plaintiff avers that the Corps' failure to completely remove Shreve's Dike exacerbated the problem by increasing the flow and velocity of the water in the Kentucky Chute.

More specifically, plaintiff opines that the erosion of the left-descending bank by the Ohio River in the Kentucky Chute was caused primarily by the construction and operation of the Dam, which allegedly increased the volume and velocity of the water. The internal erosion, plaintiff argues, was caused by the receding of the bottom or "toe" of the bank toward Mr. Smith's property, and as a result, the slope of the bank became more steep and less stable. Plaintiff next avers that the upper portions of the bank then collapsed, making the grade of the bank less steep and more stable. Accordingly, the core of plaintiff's argument is that, regardless of the theory offered as to the exact type of erosion experienced on the subject property, construction of the Smithland Locks and Dam is *the* direct and proximate result of the erosive conditions.[23]

### 2. Defendant

In response to plaintiff's inverse condemnation claim, defendant avers two arguments. First, defendant contends that plaintiff has not proven that he owns the subject property. Rather, although Mr. Smith testified to the contrary, evidence suggests that Front Street, a street included in numerous plats as Smithland property, borders plaintiff's property along the riverbank. As a result, defendant asserts that plaintiff is claiming compensation for lost acreage and preventative measures taken on land which plaintiff does not own, and that consequently, he lacks standing to bring the claim.

Second, defendant opines that, regardless of plaintiff's inability to prove actual ownership of the subject property, the Smithland Locks and Dam project was not the direct and proximate cause of the eroding bank. In support of this contention, defendant proffers two facts as dispositive. Defendant first explains that the Ohio River does not impinge upon the Kentucky shore; rather it flows along the left bank of Cumberland Island. Moreover, defendant states that the mixture of the Cumberland and Ohio Rivers is not turbulent. Thus, defendant contends that the flow of the discharge from the Dam (originating from the Ohio River) does not cause the erosion, because it never aggressively mixes with the flow of the Cumberland River until it reaches a point south of plaintiff's property.

In addition, defendant argues that the erosion experienced on plaintiff's property is not the result of high current velocities, but rather a result of an internal erosion

---

**22.** Plaintiff admits that it did not own the entire bank where the rip-rapping was placed. He maintains, however, that this is irrelevant because he was entitled to employ any reasonable measures to protect against the erosion of his property, which lies just beyond the bank. Plaintiff claims that "[He] is not obliged to stand idly by, watch his land erode, and make supplemental claims for additional erosion."

**23.** Further, it must be added that at trial, plaintiff's counsel commented that much more than the $78,306.89 was at stake. He states in his opening statement that:

The fact is that the prevention that Smith has been able to do, is a temporary measure and that the bank is still being attacked.

And that the cost of a permanent solution to this problem, may reach $1 million.

So, the important issue that the Court will resolve—over and above the money—is causation. *Because if we prove causation, the Corps will be obliged to take measures to prevent it, or we will be back.*

Tr. 44 (emphasis added).

phenomenon known as "piping."[24] Defendant claims, therefore, that piping is unrelated to the increased water levels and velocities that plaintiff claims are the consequence of the Smithland Locks and Dam system, but rather is a process which has occurred on the banks of the Ohio River for many years prior to construction.

*Issues*

There are two essential issues in this case. The first issue is—whether Mr. Smith possesses the requisite standing to bring a claim for property damage and preventative measures. Specifically, it must be ascertained (i) what property Mr. Smith actually owns; (ii) whether Mr. Smith can pursue an inverse condemnation claim for preventative measures when such measures were taken on property not owned by him; and (iii) whether Mr. Smith possesses the requisite standing with respect to the preventative measures when the costs of the project were actually incurred by a person other than himself, *i.e.*, his company, a close corporation. The second issue is whether plaintiff has satisfied the burden of proving by a preponderance of the evidence that the Smithland Locks and Dam is the direct and proximate cause of the erosion damage on Smith's property.

*Discussion*

As previously noted, *supra* note 15, the parties have definitively agreed to a settlement with respect to the damage caused on Cumberland Island stemming from the remaining portion of Shreve's Dike and the construction of Smithland Dam. Therefore, that issue is now moot, and the remaining issues concern only the proximate causes and the damages for the erosion (taking) of Mr. Smith's property in Smithland, if any, and the cost of preventative measures for rip-rapping in 1991 to the left descending bank bordering Mr. Smith's property.

1. *Standing*

The Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use,

without just compensation." As a threshold matter, the court must first address the issue—whether plaintiff has standing, or the necessary interest in the Smithland property, deeded to him on February 18, 1977, by his closely-held corporation, which plaintiff asserts has been damaged by construction of the Smithland Locks and Dam project (PX 1). *Illinois v. United States*, 15 Cl.Ct. 399, 410 (1988) ("[i]n order to make out a claim under the Takings Clause of the Fifth Amendment, plaintiff must establish that it was the owner of the property, and that such property was taken by the United States for a public purpose"), *citing Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 239–40 (1983), *aff'd mem.*, 765 F.2d 159 (Fed.Cir.1985); *Cavin v. United States*, 19 Cl.Ct. 190, 197 n. 4 (1989) ("[i]t is well-settled that a party cannot maintain a taking claim unless it owned the property at the time of the alleged taking"). In addition, it must be ascertained—whether preventative measures taken on *land*, not owned by the plaintiff, sufficiently satisfies plaintiff's burden to prove standing, and, also, whether plaintiff *personally* incurred the costs of prevention.

a. Standing With Respect
To Damaged Property

Now that the Cumberland Island issues (liability and damages) have been stipulated to the satisfaction of the parties, the discussion, *infra*, regarding standing, causation/liability and damages, relates only to the Smithland property. As previously noted, said property was initially deeded to Jim Smith Contracting Company, Inc., on June 25, 1974, by Mrs. Jean Jolly Moodie, and later, on August 26, 1977, Jim Smith Contracting Company, Inc., deeded said property to Jim R. Smith (PX 1).

Shortly after his closely-held corporation purchased said property, on or about August or September 1974, plaintiff rip-rapped the 600–foot bank bordering the Cumberland River. Again, but after said property was deeded in 1977 to him, in April and October 1991, plaintiff caused his closely-held corporation to rip-rap the 600–

---

**24.** *See supra* note 16, for a description of piping.

foot bank of the Smithland property. Plaintiff seeks no damages for the 1974 rip-rap costs, but rather, he seeks damages for the 1991 preventative costs incurred by his closely-held corporation to rip-rap the river bank. DX 5(d).

■ Defendant strenuously avers, and we agree, that plaintiff clearly has failed to demonstrate his ownership of the river bank property on which he placed the rip-rap in 1991. The most probative utterance counsel could get from Mr. Smith was that he *believed* he owned said river bank property to water's edge on which he caused to be placed the rip-rap, since the City of Smithland failed to rip-rap the 600–foot bank bordering his property when it in fact rip-rapped its own bank adjacent to Smith's property. However, on cross-examination, Mr. Smith admitted that, west of his 600–foot property line, to water's edge, where Front Street is shown on the plat (DX 5(d)), he never took steps to perfect ownership; he never inquired of the city whether it owned said property; and he does not know who owns said Front Street property except that "in my mind ... we owned it because we maintained it" (Tr. 150–53). Plaintiff has failed to put forth any probative evidence demonstrating ownership of more than the .01 of an acre of land damaged by bank erosion (Tr. 366–70, and DX 5(a)).

Mr. Smith's property is bordered on the north by Court Street, on the east by Charlotte Street, and on the south by Level Street.[25] The Cumberland River borders Mr. Smith's property on the west. This western border of plaintiff's property is reflected on various plats as Front Street, a Smithland city street (DX 5). Years of erosion apparently have dismantled the street, and no evident traces of it exist on the border of Smith's property, although the street continues to exist on the property adjacent to the north of Smith's property. *Id.* Accordingly, it is clear and we so find on this record that the riverbank bordering Smith's property on the west was once sufficiently built up to the point where it accommodated Front Street, and

that years of erosion have dismantled the bank and the street. Bertrand L. Baldes, an expert witness for defendant, testified, in this connection, that the original plat of Smithland, Kentucky, which "was drawn somewhere around 1809 and recorded in 1937 ... depicts the City of Smithland and its merger with the Ohio River [and] shows Front Street...." Tr. 355; DX 5(d). It is, therefore, clear that the riverbank bordering Smith's property was once a thoroughfare of the City of Smithland.

■ Mr. Smith hospitably asserts, notwithstanding the wealth of adverse probative evidence, that this property (Front Street to water's edge) presently belongs to him since the City of Smithland essentially abandoned it. However, it is well-settled that Mr. Smith cannot claim rights in public property in Kentucky by adverse possession or abandonment, regardless of what reason the city had not to maintain the property. For example, in *Shurtleff v. City of Pikeville*, 309 Ky. 420, 217 S.W.2d 976 (1949), the Court of Appeals of Kentucky stated that:

> When streets are set apart and dedicated to the public use, and a town or city is built on the ground so laid off for this purpose, the city authorities are not required to take physical possession or control of each street, or to improve it in order to save their right to reclaim it against any person who undertakes to hold it adversely. Nor is there any period fixed by statute or judicial ruling in which a street so dedicated must be taken possession of by the city or improved by it in order to prevent an abandonment. The city may delay manifesting its acceptance by control and improvement as long as it pleases. It may wait until the needs of the public or the city require its improvement, and in the meantime, and since the statute of 1873, no person may take possession of a street dedicated to public use, although there may have been no record acceptance of it or overt act of control, with-

---

25. *See* Appendix Two for a description of subject area.

out giving the statutory notice of his intention to appropriate it.

*Id.* 217 S.W.2d at 977, *quoting, City of Henderson v. Yeaman,* 169 Ky. 503, 184 S.W. 878, 882 (1916). Mr. Smith admittedly has never taken steps to perfect title in any Smithland property adjoining his land, and he merely "believes" the property is his because the City of Smithland has not cared for the property since he purchased Smithland in 1977 (Tr. 153). It is clear beyond cavil, therefore, that, in general property law and under the laws of the State of Kentucky, a naked perception is not enough to gain possession of public land. Therefore, the testimony of Mr. Baldes confirms that the land records clearly establish that, as of the present time, the city is the lawful owner of the right-of-way along the eroded bank, *i.e.,* Front Street to the water's edge.

Plaintiff adduced not one scintilla of probative evidence to dispute defendant's evidence with regard to the damage to Smith's property abutting the riverbank, but rather stated that defendant's arguments concerning the amount of actual damaged property were inconsequential. Pl.'s Response to Def.'s Findings at 7–8. Specifically, plaintiff argues that regardless of whether the "amount of land lost is .01 acres or .05 acres," if the government is found liable, it is responsible "not merely for the value of land already taken but also the cost of preventing further erosion." *Id.* In light of the foregoing evidence presented at trial, supporting documents, and case law, plaintiff has failed to carry his burden of proving that he owns more than .01 of an acre of land damaged by bank erosion. Accordingly, plaintiff possesses standing with respect to only .01 of an acre of land allegedly subject to damage by erosive factors.[26]

### b. Standing With Respect to Preventative Measures

An additional standing issue which must be addressed relates to the contiguous area running 600 feet north to south and west to water's edge with respect to which preventative measures were taken by Mr. Smith, on the bank abutting his Smithland property. Specifically, this is the property that lies between Smith's west lot line, *i.e.,* the east line of Front Street running west and to the Cumberland River at water's edge (DX 5(d)). Since the record shows that plaintiff has totally failed to demonstrate that he is the fee owner of such property, the question arises as to whether he has standing to bring a takings claim for preventative measures when such measures were placed on property owned by another and not the plaintiff. No case law was proffered and none was found on this point; however, plaintiff strenuously asserts that a party would possess standing to bring such a claim. The law of takings, plaintiff argues, clearly allows for damages for *preventative* measures. *United States v. Dickinson,* 331 U.S. 745, 751, 67 S.Ct. 1382, 1386, 91 L.Ed. 1789 (1947). Therefore, the contention goes, if plaintiff can prove that *he* did incur the costs of prevention, it would appear, on the authority of *Dickinson, supra,* that that precedent is sufficient to satisfy plaintiff's burden of standing, even though the rip-rap was placed on property other than his own, *i.e.,* the city's property. Standing requires an affirmative showing by plaintiff that he has "been injured or been threatened with injury by governmental action complained of, and focuses on whether the litigant is the proper party to fight the lawsuit ...," *i.e.,* to ameliorate the injury. *Black's Law Dictionary* 1260 (5th ed. 1979). Accordingly, if plaintiff can appropriately establish that *he* incurred *the* costs of prevention, in proof of the fact that he has the requisite standing to bring a claim for preventative measures in an inverse condemnation case, it would appear to be immaterial that such measures were not placed on his property. While, at first blush, this hospitable conclusion would appear to resolve plaintiff's standing problem, further analysis of the operative facts

---

**26.** *See* Appendix Two for an approximation of the property to which plaintiff possesses requisite standing.

discloses that, on the issue of entitlement, it gives plaintiff no comfort.

■ This is so because when one looks at the record evidence in this case, it establishes, indisputably, through the testimony of plaintiff, that Jim Smith Contracting (a/k/a Jim Smith Contractors) actually incurred the costs of any such prevention (*i.e.,* of installing the rip-rap in 1991), and not Mr. Smith personally. Moreover, and of equal significance, is the fact that a close scrutiny of the record fails to establish any proof that Mr. Smith reimbursed his closely-held construction company for the cost it incurred for rip-rapping the bank. It is true that plaintiff's construction company is a closely-held entity with Mr. Smith owning 92% of the common stock therein and his sons owning the 8% balance. Nevertheless, it is well settled— "that a corporation is a separate ... entity [from its shareholders] even if it has only one shareholder who exercises total control over its affairs." *Commissioner v. Bollinger,* 485 U.S. 340, 345, 108 S.Ct. 1173, 1177, 99 L.Ed.2d 357 (1988), citing to *Moline Properties v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). Given such circumstance, it was the artificial entity, Jim Smith Contracting, that incurred the $78,000 expenditure allegedly in preventative maintenance. Said entity did not own Smithland in 1991, when the expenditure was incurred, nor is it a party to this suit. Similarly, while James R. Smith, the 92% shareholder, is the plaintiff in this action, he has neither paid nor incurred any such expenditure. To that extent, he has failed to establish by the requisite burden that he has been injured by having to pay any preventative costs to obviate and/or abate erosion.

In light of the foregoing, it is hereby held that since Jim Smith Contracting actually incurred the cost of rip-rapping the bank, and since the company is a separate entity from Mr. Smith, we are constrained to conclude that plaintiff has not incurred any injury which would provide him with the necessary standing to bring his claim for preventative measures. This is particularly so because there exists no evidence proving that he in fact reimbursed the company at any time, directly or indirectly. Therefore, this court holds that plaintiff does not possess standing to bring a claim in the approximate amount of $78,000 for preventative measures. To the extent that there are any grounds for damages due to a taking claim on the facts at bar, relative to the Smithland property, plaintiff's standing appears to be limited to .01 of an acre of said property.

### 2. *Burden of Proof*

■ There can be no dispute that the United States possesses the requisite authority to improve navigable waters in the interest of navigation. *See United States v. Kansas City Ins. Co.,* 339 U.S. 799, 804, 70 S.Ct. 885, 888, 94 L.Ed. 1277 (1950). However, it has also been established that the government is liable under the theory of Fifth Amendment takings when it makes improvements on navigable waters which cause damage to privately-owned property. *Loesch v. United States,* 227 Ct.Cl. 34, 42, 645 F.2d 905, 912–13, *cert. denied,* 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981). *Owen v. United States,* 851 F.2d 1404, 1412 (Fed.Cir.1988) ("Supreme Court precedent undeniably requires our holding that the navigational servitude does not provide a blanket exception to the Takings Clause of the Fifth Amendment where improvements to navigation made by the government result in erosion to land located above *or* outside the bed of the stream...."). In order to overcome his burden, plaintiff must prove by a preponderance of the evidence, *i.e.,* that it is more probable than not,[27] that the "construction and/or operation of the [Smithland Locks and Dam] was the direct and proximate cause of the erosion which has taken place, and is taking place, on [Smith's] property." *Id.* 227 Ct. Cl. at 43, 645 F.2d at 913. If plaintiff is

---

27. The preponderance of the evidence standard simply requires "the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *In re Winship,* 397 U.S. 358, 371–72, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970).

successful in overcoming this burden and establishing liability, the usual measure to determine "just compensation" pursuant to a Fifth Amendment taking "is the fair market value of the property, which is the price that a willing buyer would pay to a willing seller." *Yaist v. United States,* 17 Cl.Ct. 246, 257 (1989), *citing United States v. 50 Acres of Land,* 469 U.S. 24, 29, 105 S.Ct. 451, 454, 83 L.Ed.2d 376 (1984).[28] In addition to being compensated for the value of the land taken if plaintiff overcomes its burden, it has also been held that "[i]f the resulting erosion which, as a practical matter, constituted part of the taking was in fact preventable by prudent measures, the cost of that prevention is a proper basis for determining the damage...." *Dickinson,* 331 U.S. at 751, 67 S.Ct. at 1386. Accordingly, if plaintiff can prove the Smithland Locks and Dam project was a direct and proximate cause of its eroding bank, plaintiff will be awarded the fair market value of .01 of an acre of his property and the costs of protecting his property from further erosion if he can prove such measures were prudent and reasonable,[29] *and that he in fact incurred the costs.* Our analysis of the trial transcript and supporting documentation compels us to hold that plaintiff has failed to prove by a preponderance of the evidence that the Smithland Locks and Dam was *the* direct *and* proximate cause of the bank erosion which damaged .01 of an acre of his property.

Plaintiff's essential theory is that the construction of the Smithland Locks and Dam and the concomitant partial destruction of Shreve's Dike caused a greater percentage of the flow of the Ohio River to be diverted toward the Kentucky side of the river, at a greater velocity, thereby increasing the erosion of the riverbank abutting Mr. Smith's property. In support of his position, plaintiff relies primarily on his self-serving testimony and the testimony of his expert witness, Dr. Charles D. Morris.

### a. Testimony of Mr. Smith

Mr. Smith testifies that he first placed rip-rap on the river bank abutting 'his' property in 1974,[30] at about the same time the Army Corps of Engineers was placing rip-rap upstream from 'his' property. Tr. 76. His reasoning was that the slope of the bank required such protection from the river. Recognizing that the critical factual issue is whether plaintiff has satisfied his burden of proving, by a preponderance of the evidence, that the Smithland Locks and Dam is *the* direct and proximate cause of the erosion damage on his fee interest at the southwesterly end of his lot line, *i.e.,* at the top of the bank (DX 6(a)), defendant propounded the following series of questions that adduced telling and probative responses:

Q. ... Did you see any evidence of erosion on your property along the river in 1974, when you acquired it?

A. Yes. There was some erosion.

Q. On your property?

A. On my property.

Q. And where did you see that erosion?

A. Up and down the 600 feet.

Q. Describe the character of it....

A. ... just some erosion....

Q. Did you have any erosion that you could see, at the top of the bank at that time?

A. Yes, sir. I'd say there was probably some at that time....

Q. So you saw some failure exhibited at the top of the bank?

A. Very little. Not—not all that much.

---

28. This standard, however, is not an "absolute or exclusive method of valuation." *United States v. Virginia Electr. & Power Co.,* 365 U.S. 624, 633, 81 S.Ct. 784, 791, 5 L.Ed.2d 838 (1961) (citations omitted). For example, the "court may use its judgment in selecting the method to determine fair market value." *Yaist* at 257, *citing United States v. 22.80 Acres of Land,* 839 F.2d 1362, 1365 (9th Cir.1988). This method, however, "must reflect economic realities and not be based on speculation or conjecture." *Id.*

29. Therefore, if plaintiff satisfies his burden, he will be entitled to the cost of rip-rapping the riverbank bordering his property, as long as the rip-rapping procedure was a prudent and reasonable method of prevention.

30. Plaintiff concedes that "[his] efforts in 1974 ... are outside the statute of limitations period, [and] are no longer compensable." (Pltf's Post–Trial Brief, p. 8.)

Q. ... do you recall when the dam was constructed?

A. Yes, sir.

Q. When would that be ...?

A. ... it was finished in [19]79.

\* \* \* \* \* \*

Q. ... You saw erosion on the bank of this property five years before this dam construction was even completed. Is that not right?

A. That is correct. It did have some erosion. Sure, just like any river bank would have.

Tr. 155–56.

The time period of this particular rip-rapping was several years *prior* to completion of the Smithland Locks and Dam project, which unequivocally suggests that the river bank was experiencing erosion *prior* to construction and completion of the dam. This circumstance could provide a probable explanation for the erosion of .01 of an acre at the southwest corner of his lot line.

Mr. Smith also testified that, thereafter, he did not notice further erosion until "after [1979]," [31] *Id.*, at 83, and that there was not much erosion before Cumberland Island experienced significant erosion. *Id.* at 84. Moreover, plaintiff testified that the circumstances under which he noticed the erosion was when the rip-rap on the bank and the top of the bank "began to slough off." *Id.* at 84–85. In addition, Mr. Smith testified that at "high water" the greatest degree of erosion occurs. The "high water" erosion occurs, according to plaintiff, when the Smithland Locks and Dam system causes additional water to flow over to the Kentucky side from the Ohio River, and prior to the construction of the dam, the dominant amount of water flow occurred on the Illinois side. *Id.* at 85, 109. We do not find the totality of this testimony to be persuasive. The fact that Mr. Smith noticed increased erosion at high water levels as compared to low water levels could as easily support defendant's theory of *piping, infra,* as testified to by defendant's expert(s) as it does plaintiff's theory of bank erosion due to alleged increased river flow against the bank. Since "piping" is an internal erosion mechanism process which in fact occurs when a river bank is submerged for a period of time and then subsequently emerges from the overflow, the testimony of defendant's expert, Mr. Gordon Lance, *infra,* would suggest that "piping" may have been the cause of the *de minimis* erosion in this case to the .01 of an acre of plaintiff's property.

b. Testimony of Plaintiff's Expert Witness Dr. Charles D. Morris

Plaintiff's expert witness was Dr. Charles D. Morris, a professor of civil engineering at the University of Missouri at Roland. Tr. 195. Dr. Morris obtained a bachelors degree in civil engineering in 1967 from the University of Missouri at Columbia, a masters degree in civil engineering in the specialty area of hydraulics and fluid mechanics in 1968 from the University of Missouri at Columbia, and a Ph.D. in hydraulics in 1978 from the University of Illinois at Champaign/Urbana. *Id.* Following receipt of his masters degree, Dr. Morris joined the United States Public Health Service for two and one-half years as a sanitary engineer. Following his tenure with the Public Health Service, Dr. Morris entered his Ph.D. program and completed his course work in two years. A number of courses were in applied mathematics, theoretical applied mechanics, and hydraulics. *Id.* at 199–200. After two years of course work, Dr. Morris left the University of Illinois, and accepted employment with a local Urbana consulting firm, for which he worked for approximately four years. *Id.* at 201. At the consulting firm of Clark, Dietz and Associates, Dr. Morris progressed from a design engineer at the firm to a director of the Hydraulics and Hydrology Division, in which he was in charge of all hydraulics designs. *Id.* at 202. Dr. Morris's next position was as a hydraulic engineer for the Illinois State Water Survey where he was in charge of a number of flood studies, and during this time he also completed his Ph.D. Follow-

---

**31.** The Smithland Locks and Dam was completed in 1981 (Tr. 391 and PX 11), although Smith states that completion occurred approximately in 1979. Tr. 156.

ing the receipt of his degree, he accepted employment with Camp, Dresser and McKee, a consulting firm involved in hydraulics. *Id.* at 205–06. After two years with said firm, Dr. Morris accepted employment with the University of Missouri at Roland, where he presently resides, and teaches undergraduate and graduate courses in the area of hydraulics. *Id.* at 208–09. Finally, Dr. Morris has testified as an expert witness approximately 12 to 15 times on the subject of hydraulics. *Id.* at 211–12.

In preparation for trial, Dr. Morris visited the Smith property, areas downstream of the Smith property, and the Smithland Locks and Dam. In addition, Dr. Morris viewed a number of charts which were produced by the Army Corps of Engineers, some dating back to the time that Shreve's Dike was constructed, and other charts which showed the depth of the Ohio River in different locations. *Id.* at 212–13. Based on the foregoing information, Dr. Morris constructed a Hydraulic Engineering Center Two Model (HEC 2),[32] which is utilized to "compute the back water on the hydraulics of a flowing river," *Id.* at 213, as well as to determine how much flow crosses the river toward Kentucky. *Id.* at 254. In order to compute the flow of a river in an HEC 2 model, Dr. Morris opined that he "needed to have information of the cross-section of the ground in the flood plain, or near the river, as well as the elevation of the bottom of the river" since "the depth and velocity of flow across the

river and in the flood plain" is a topography measure which is the first factor necessary when utilizing such a model.[33] *Id.* at 213–14.

Dr. Morris noted with respect to the Smithland Locks and Dam that, "during a flood condition, all the water that did go from the lock and dam, generally, or the bank of the river before the lock and dam was put in, to high ground on the Illinois side, now is going to have to be discharged to the left of the existing position[ed] lock and dam, which means that [that] amount of water is shifted to the Kentucky bank."[34] *Id.* at 229–30. Dr. Morris also placed significance on the Corps of Engineers' placement of some dikes[35] at the southern-most end of the locks and dam. According to Dr. Morris, these dikes are usually utilized to divert the flow of high velocity waters away from barges moving upstream so they may more easily "get lined up and get into the lock." It is these dikes,[36] *supra,* which Dr. Morris insists kick the high velocity waters of the Ohio River towards the Kentucky shore side, thereby increasing the erosion of the river bank abutting Mr. Smith's property. *Id.* at 233. However, it is not merely the locks and dam project, according to Dr. Morris, which has accounted for the erosive factors. In addition, Dr. Morris opined that remnants of Shreve's Dike exist in the Ohio River wherein it takes the flow from the dikes of the locks and dam, and they channel "the water ... more directly into the head of Cumberland Island."[37] *Id.* at 235.

**32.** PX 28 is a composite of the HEC 2 model.

**33.** To determine the amount of flow crossing the river, Dr. Morris chose several areas (cross-sections) where he measured the flow. He testified that, according to his calculations, "if my memory serves me, 83% of the flow in the river passes between the Illinois side of the river, and the Illinois side of Shreve's Dike." *Id.* at 258. Accordingly, the balance of the flow of the river (17%) passes between the Kentucky side of Shreve's Dike and the Kentucky bank. However, Dr. Morris said his calculations also show that when water passes through the locks and dam, there is nearly a doubling of flow (33%) along the Kentucky bank, in the vicinity of Smith's property. *Id.* at 262. Dr. Morris, therefore, opined that this clearly demonstrates the crossing over.

**34.** This opinion mirrors the testimony of Mr. Smith with respect to higher water levels on the Kentucky side following construction of the Smithland Locks and Dam.

**35.** These dikes are structures which point downstream but contain curvature toward the end which make them point almost directly toward the northern tip of Cumberland Island.

**36.** *See* Appendix One for a diagram of the Smithland Locks and Dam and the dikes.

**37.** Dr. Morris believes it is a combination of the dikes of Smithland Locks and Dam, and the remnants of Shreve's Dike which are concentrating the flow and directing it at the head of Cumberland Island. Moreover, Dr. Morris also believes that if Shreve's Dike had been totally

Dr. Morris also testified that a scour hole exists very close to the head of the island which was created by the heavy flow being directed thereat, and subsequently is deflected toward the Kentucky bank. *Id.* at 239. Essentially, Dr. Morris's position is stated as follows:

I believe that the energy and flow, the velocity of flow that is attacking and eroding the head end of Cumberland Island, is traversing along the island, and then, being deflected because of the fact, and this is a very well-documented phenomena in river mechanics, that when we have a bend in the river, and if you will, if you look at this part of the river as a bend, which it is, in the river, what happens is we have the high velocity of flow. A river around a bend flows or moves due to centrifugal force to the outside of the bend. I believe this high velocity flow that is causing the erosion of the head of Cumberland Island is traversing across the chute, and attacking the left descending Kentucky bank in the neighborhood of the Smith property and downstream from that, causing erosion to that area of the bank.

Tr. 242.

Finally, Dr. Morris concludes that the Cumberland River "is a relatively small component of the total flow" (PX 26(a)). Specifically, when Dr. Morris was asked by the court about the impact of the Cumberland River on the force of the water coming down from the Kentucky side and the Illinois side of the Ohio where the two rivers intersect, he testified that:

My opinion is, Your Honor, the impact on the Kentucky bank, when the Cumberland is low flows and the Ohio is at high flows, is much more pronounced than, of course, if the Cumberland is at high flows at the same time the Ohio is at high flows. And, we have, in the

exhibits, there is an aerial photo showing the—in fact, I believe it was testified to earlier, showing the interreaction [sic] between the two flows.

But, it's my opinion that, even if there is a substantial flow from the Cumberland River, and in my model, which is the flows that I use were taken from the Corps' physical model. And, to give you an idea of the relative magnitudes of those flows that the Corps used in their physical model, and I, likewise, used in my mathematical model, 40,000 CFS [38] is coming in from the Cumberland. And, the total flow in the Ohio River, upstream of the Cumberland, is 750,000 CFS. So, it's a relatively small component of the total flow. Nevertheless, it does contribute to the flow.

Tr. 266–67. To illustrate his position, Dr. Morris made reference to an aerial photograph of the intersections of the two rivers (PX 26(a)). The quality of the photograph is very poor because of its darkness, and is virtually of no use to the court. However, Dr. Morris notes that with respect to the photograph:

There is what I call, we call in hydraulics, a shear, free shear [39] layer between the two flows, which occurs where the compliments of the Kentucky chute and Cumberland River come together. And, one can see turbulence that is mixing, that's occurring along that interface. And, I believe, again, that high velocity is coming over here [from the Ohio River] and interacting with the Cumberland flow and causing the high velocity in the Ohio. And, the cross-over flow is causing some of that turbulence and mixing, and that is also conducive to erosion.

Tr. 268 (footnote added).

Although the testimony of Dr. Morris would, at first blush, appear to demon-

removed, the damage to Cumberland Island would not have been as egregious. Tr. 247. Surprisingly, Dr. Morris also believed that without Shreve's Dike, there may have been an even greater force on the Kentucky side. *Id.,* 248. Dr. Morris's rationale is that had the entire Shreve's Dike been removed, then the flow would have been more expansive to the Kentucky side. *Id.,* 247.

38. Cubic Feet per Second.

39. With respect to the capability of the river to erode the bank, Dr. Morris stated that free shear is a process which "increases the velocities and the direction of the turbulence, the intensity of the turbulence in the flow, which increases the rate of erosion." Tr. 268.

strate some causation between the construction of the Smithland Locks and Dam and erosion to Mr. Smith's property, however, the weakness of his testimony was exposed by further analysis of the exhibits and on cross-examination. For example, the following vexing problems were found in Dr. Morris's testimony and model. First, Dr. Morris admitted that he had not performed any additional *physical* testing to confirm his velocity hypothesis, *i.e.*, he has not placed any devices in the river to ascertain velocities at the Kentucky bank, but merely relied on his so-called model study which primarily utilized data compiled by the Army Corps of Engineers.[40] Tr. 289. Secondly, Dr. Morris admits that there were forces causing erosion along the bank *prior* to construction of the Smithland Locks and Dam project, as evident from the caving bank situation in the area immediately to the north of Smith's property. Tr. 297. Thirdly, and of greatest importance, Dr. Morris admitted that the most frequent and general use of the HEC 2 model is to determine flood or water surface elevations, and it is not *generally* used for determining whether erosion has occurred.[41] Tr. 304. In addition, the HEC 2 study is only a one-dimensional model, which means that Dr. Morris studied the effects of the river only with the Smithland Locks and Dam in place, and did not formulate a model without the Smithland Locks and Dam in place in order to form a more effective comparison.[42] Tr. 310–14. Moreover, when the court inquired whether a two-dimensional model, which measures flow prior to and after dam construction, would have produced a more accurate opinion, Dr. Morris answered as follows:

THE COURT: Would not a two dimensional model, [depicting] what occurred before and after the installation of these respective dams, have produced a more accurate opinion?

THE WITNESS: Yes.

THE COURT: And you did not do that?

THE WITNESS: That's correct, Your Honor.

\* \* \* \* \* \*

THE COURT: Do you know, as you sit there, Dr. Morris, what the variance would be had you performed a two dimensional model, [and] then made a comparison with your one dimensional [model] before and after?

THE WITNESS: My opinion—

THE COURT: Yes or no, sir, do you know, as you sit there, what the variance would be?

THE WITNESS: No.

\* \* \* \* \* \*

THE COURT: So you really don't know how wide, whether or not it's going to be substantial, modest or minuscule?

THE WITNESS: Exactly.

(Tr. 313–15). In fact, although Dr. Morris stated that a two-dimensional model is more expensive to construct, he agreed that it would have been more accurate, and that the HEC 2 model does not provide certain information.[43] Tr. 332–33. Moreover, Dr. Morris's model utilized a very high water elevation of 333 feet as a factor input, which he agreed is a rare occurrence in that it comes along only "somewhere

---

40. For example, Dr. Morris agreed that velocities of three to four feet per second would be sufficient for the onset of erosion for the type of soils he saw on the bank. Tr. 298. However, it was noted on cross-examination that Dr. Morris previously referenced in a deposition that velocities, *prior to construction of the Smithland Locks and Dam,* reached five to seven feet per second through the Kentucky Chute. Tr. 289–300. However, Dr. Morris also noted that this figure of five to seven feet per second was "based on some publication that I had reviewed." Tr. 300–02.

41. In fact, PX 30, which is the HEC 2 model, says in the upper left hand corner: "HEC 2 Water Surface Profiles."

42. Nor did Dr. Morris run a study without Shreve's Dike in place. Tr. 310. Also, in a one-dimensional model, the flow of the river is assumed to be perpendicular to the cross-section, and, therefore, such a model would show no flow across the river. Tr. 313.

43. Dr. Morris stated, however, that his model did accomplish its purpose by demonstrating "the magnitude and direction of the secondary currents in the river.... I did that through the use of a one-dimensional model." Tr. 331–32.

between a five and ten year" period. Tr. 323–24.

 In light of the foregoing testimony of both Mr. Smith and Dr. Morris, we are not persuaded that plaintiff has carried his burden of proving, by a preponderance of the evidence, that it was the construction of the Smithland Locks and Dam that was the direct and proximate cause of the erosion to .01 of an acre of his property. It is unmistakably clear that some erosion of the bank abutting Mr. Smith's property occurred *prior* to construction of the dam, as is evident from the testimony of both Mr. Smith and Dr. Morris. Moreover, Dr. Morris's technique of analyzing the problem from a scientific standpoint appears to be seriously flawed. This is evident by the fact that Dr. Morris admitted that he never measured the velocity of the river; that his model was not the most adequate methodology to ascertain the erosion phenomenon that is occurring to the Kentucky bank; that he does not know what the findings would have been had he conducted a two-dimensional HEC–2 study; and that a two-dimensional study is more accurate than the study he conducted. In addition, the water elevation (*i.e.*, 333 feet) that he inserted into the model was so rare that admittedly it would occur only once every five or ten years. Finally, PXs 23 and 24 [44] demonstrate that the flow of the Cumberland River may actually block the cross currents created by the Smithland Locks and Dam project. For example, both exhibits, particularly PX 23, show coloration differences between the two rivers. The Cumberland River is viewed as much darker than the Ohio River, and, where the two rivers merge near Mr. Smith's property, a clear line of demarcation continues to exist between the rivers as evident by the continuance of their colors *well past* the Smith residence. It is not until well past the Smith residence that a slight mixture of the colors can be seen. This picture is worth a thousand words, in that it can support a reasonable hypothesis demonstrating that the Cumberland River flow may be a, if not *the*, significant erosive factor impacting the bank bordering Mr. Smith's property. Accordingly, given the totality of the evidence, even at this posture, and the reasonable inferences deducible therefrom, we find that the preponderance of the evidence standard has not been satisfied since this court cannot find that the existence of plaintiff's proposed factual findings regarding his erosion theory are "more probable than their non-existence."

c. Expert Testimony by Defendant

i. *Testimony of Defendant's Expert Witness Gordon Lance*

While we have found that plaintiff has failed to independently establish *prima facie* proof of his burden, defendant's probative evidence, we find, further exacerbates, *i.e.*, sheds further light on, the weaknesses of plaintiff's case. This is so because the defendant adduced through Gordon Lance, an expert witness, additional probative evidence demonstrating other reasonable probable alternative causes for the damage to the southwest corner (*i.e.*, .01 of an acre) of Mr. Smith's property. Mr. Lance is a hydraulic engineer [45] employed by the Ohio River Division of the Army Corps of Engineers. Tr. 379. In general, his responsibilities include the review of hydraulic studies at the division level that are produced by the four districts within the Ohio River Division. Tr. 379. Mr. Lance began his career in hydraulics and hydrology following his graduation from the University of Cincinnati in 1961, where he earned a bachelors degree in civil engineering. Tr. 380. Additional education obtained by Mr. Lance include "some graduate work at the Purdue [University] Extension In Indianapolis in the area of computer science, and ... a number of courses that the [Army] Corps

---

**44.** PXs 23 and 24 are aerial photographs of the Ohio River, Cumberland River, and the City of Smithland.

**45.** According to Mr. Lance, hydraulic engineering "involves the design of structures that are associated with the flow of water, such as dams, dikes, conduits, levees, sewer systems." He is also involved with hydraulic studies which "involve ... estimating the amounts and quantities of water that will have to be handled by these types of studies." Tr. 379–80 and 384–85.

of Engineers holds on various subjects related to hydraulics and hydrology." Tr. 380. Prior to his present responsibilities, Mr. Lance worked for 15 years for the Indiana Department of Natural Resources in the Division of Water where his principal duties involved "the definition of flood plains in Indiana and land use regulation within those flood plains ... [and] some studies related to construction of various hydraulic projects...." Tr. 381. Following his employment in this capacity, Mr. Lance worked "as a hydraulic engineer in the hydraulics and hydrology branch of the Louisville District of the [Army] Corps of Engineers." Tr. 380. A major construction project which Mr. Lance has been involved with in his employment history is the hydraulic design of the Olmsted Locks and Dam. Tr. 381. Additionally, Mr. Lance has testified as an expert witness in the field of hydraulic engineering and hydrology approximately 10 times at both the state and federal levels. Tr. 383.

With respect to the Smithland Locks and Dam project, Mr. Lance testified that it is a "navigation project only ... [and is] intended to maintain a minimum pool of navigation between the dam itself and the next dam upstream." Tr. 387. When Mr. Lance conducted an investigation of the site at issue in October of 1990, he observed the following:

> Briefly, we found actively failing banks on the head of the island. We found very sharp lines, very definite evidence of bank failure all the way across the head of the island. We noticed a strong current across the head of the island sweeping from west to east, as we're looking at the map right now. We found the banks beyond the rounded part of the head of the island approaching stability, and ...
>
> * * * * * *

> ... We also noticed stability fairly close to the active head of the island on the banks on [the west] side.
>
> * * * * * *

> ... [The] part of the head of the island, as I described it, was actively eroding, and we had a strong current running parallel to the head of the island following the island contour as it swept on down into the Kentucky chute.
>
> * * * * * *

> That is to say, the current was strong, and it was noted here, I always like to stop the boat that we're in and see how fast we drift, and *we moved along very smartly 'til we got down to approximately the point that I'm going to call stability which is more or less directly across from the City of Smithland,* then the current seemed to dissipate; it wasn't near as strong. There's a current that comes down from Cumberland River, and it sort of merged with that current and we noticed no special current other than the normal river current.

Tr. 401–02 (emphasis added).

In addition, Mr. Lance had photographs taken during his visit. One photograph (DX 3, photograph 1, page 1) was taken from the Kentucky bank at the intersection of Court Street and Front Street on the bank of the Ohio River looking north toward the area where the Cumberland Island intersects with the Ohio River. This is not an aerial photograph as are PXs 23 and 24, but it likewise shows the different coloration patterns of the Ohio River and Cumberland River—the Ohio River again appears much lighter than the Cumberland River. Mr. Lance testified that the disparity in color was due to the sediment load carried by the Ohio River, versus the dark blue color of the Cumberland River which results because the river is dammed approximately 30 miles upstream, and "the releases that are made down the Cumberland River are clear water." [46] Specifically, Mr. Lance opined that:

> waters are clearly separated upstream since a different pattern in fact emerges downstream, demonstrating that the two flows are capable of interacting. Tr. 460.

---

**46.** Although Mr. Lance says the water is neatly separated upstream near Mr. Smith's property, he also testified that further downstream the waters do start to "intermingle and intermix." This tends to support his argument that the

The water that flows along the riverfront in the City of Smithland is *Cumberland River water.* The Ohio River water that flows around the head of the island hugs the right descending bank [Cumberland Island] as it proceeds down the Kentucky [C]hute.

Tr. 410 (emphasis added). Further, in this connection, he testified as follows:

Q. Let me get back to photograph No. 1 [DX 3] for just a moment.

A. Okay.

Q. The one ... in which you describe that the waters of the Ohio River were brown in color and the waters of the Cumberland River are clear or blue.

A. Yes, sir.

Q. What would be the significance of that, besides the obvious color distinction in that photograph?

A. What it is really telling you from this line of demarcation between the two rivers is that *the Ohio River water does not impinge upon the Kentucky shore, but rather is diverted and flows down the right or west side of the Kentucky chute.*

Tr. 412-13 (emphasis added). Mr. Lance further explicated his opinion by concluding—

That when you are out on the boat and traversing across this line of mixture, you can not see it from a boat; you have to get up in the air a little bit to see it. Also, it's a non-turbulent mixture. As I say, we went across this in the boat and didn't even know it was there. *When we got up above it and looked down on it, we could see it.*

Tr. 413 (emphasis added).

With respect to his observations concerning bank erosion between Cumberland River and Mr. Smith's westerly lot line at Front Street, which he walked, Mr. Lance testified that he noticed failure of the riprap *only at the upper portion of the bank.* His explanation was as follows:

... The failure activity seemed to be confined intermittently to the top ten feet of the rip rap. The lower portion of the rip rap was in good, sound condition, and we could observe—although it doesn't show too well in the photographs—some of the fine materials from the upper portion of the bank had migrated down slope and were laying on the lower slope of the bank. Portions of the rip rap were invaded by vegetation; some to the point where it obscured the rip rap, but there were some stands of fairly significant sized willows, perhaps one inch in diameter in trunk size at the ground level.

THE COURT: What is the significance of the vegetation?

THE WITNESS: The vegetation simply indicates that the rip rap has not been disturbed in those areas.

THE COURT: Why did you reach that conclusion because of the existence of the vegetation?

THE WITNESS: The existence of the vegetation generally indicates that plants are beginning to take hold and move up through the rip rap.

THE COURT: So, you are saying that if there had been a heavy flow of water through the rip rap, the vegetation would not have grown?

THE WITNESS: One inch willows, if they're well-rooted, can withstand a heavy flow of water. If there is a strong flow of water, though, against the rip rap, we would not have seen the fine material that was deposited on the top of the rip rap. That gets washed away first before the stone gets dislodged. In other words, the rip rap would have been clean. We would not have seen any sand, gravel, or smaller particles of rock.

Tr. 416-17.

In addition to the foregoing rebuttal, Mr. Lance also identified a pipe which was protruding from the top of the bank bordering Mr. Smith's property. In his testimony, he opined that if the pipe was an open conduit, water would enter the pipe. However, he also concluded that if it was closed, "as in a sprinkler head, water would not enter it, but would flow back into the soil profile along the outside of the pipe." Tr. 418. Therefore, Mr. Lance is proffering the opinion that the pipe is exposed to high water conditions which occur on this prop-

erty every year, the results of which would be that—

> ... as the river fell out or dropped below the elevation of the pipe, the water would migrate out riverward and exit in the vicinity of the pipe, and that's what we thought was happening here. The water is emerging following that pipe contour, it's taking the soil material with it, the rip rap did not have a proper bedding in the upper portion of the stone, and fine materials were exiting the soil face. Undermine the foundation for the large rip rap stone, they were failing and falling down slope, and that was essentially what we feel is happening to the upper portion of the slope in the Smith property.

Tr. 419.

Finally, Mr. Lance testified that the City of Smithland caused its property adjoining Mr. Smith's to the northeast to be rip-rapped in the early 1970's by the Army Corps of Engineers, where the Corps had "authority granted [pursuant to a previous river and harbor act allowing] to protect an actively failing bank when that bank is threatening a public facility .... [i]n this case the public facility that was being threatened was Front Street...." Tr. 421. This exposition by Mr. Lance clearly sheds light on the dynamics of the erosion on the Kentucky banks abutting Mr. Smith's property inasmuch as his ultimate conclusion is that historically there has been "ongoing [bank erosion]" threat stemming from a point in time *preceding* the construction of the Smithland Locks and Dam.

### ii. Testimony of Defendant's Expert Witness Dr. Donald Hagerty

The last expert witness called by defendant was Dr. Donald Joseph Hagerty, a civil engineer, and professor of civil engineering at the University of Louisville, a position he has held for 23 years. Tr. 476–77. Dr. Hagerty is also involved in outside consulting activities, including a position as consultant to the Army Corps of Engi-

neers. He earned both his bachelors and masters degrees in civil engineering from the University of Louisville, and masters and Ph.D. in civil engineering with a specialization in geo-technical engineering [47] from the University of Illinois at Champaign/Urbana. Tr. 478. With respect to professional writings, Dr. Hagerty has published 35 papers in reference journals, and an equal number of papers in conference proceedings in addition to having published or co-authored seven books. Moreover, in 1981, he also published a paper entitled "Bank Failure and Erosion on the Ohio River" in *Engineering Geology*, a journal in the Netherlands. Tr. 480; DX 7.

His essential professional opinion is that—*if* plaintiff's theory was correct, which avers that the current from the Ohio River had undercut the soil at the bottom of the river under the bank abutting plaintiff's property and the entire bank slid down, then the vegetation and trees which have grown out from under the rip-rap would not have remained in place. Specifically, Dr. Hagerty noted that the trees and vegetation were green and growing well, which he believed would not have occurred if the entire bank had slid. Tr. 524. Rather, Dr. Hagerty argues that the cause of the failure is "piping." For example, he stated:

> Now, the reason I say that is because that's the mechanism certainly on the island. And, if I go just down stream of the rip rap zone on the left descending bank, as I did, the bank is very severely eroded. And again, I look for the diagnostic features. If water coming out of the bank had done this, it should leave its mark. For the next three or four miles downstream is runnels and reels and gullies coming out of the bank toward the river and stair step topography in the bank.
>
> I found that as much as four miles downstream where there's no current effect from being in the chute. You're not even in the chute anymore down there. I found the same kind of topography there

---

**47.** Dr. Hagerty defines geo-technical engineering as—"that branch of civil engineering which specializes in the design and analysis of struc- tures built in and on the earth and the analysis of the behavior of soil and rock and water, all acting together."

as just downstream from the rip rap where there's a lot of runnels, reels, gullies coming out toward the stream indicating a lot of water had come out.

And that's why I think if current were a really important factor here, it would tend to smooth out all of those rills which essentially are perpendicular to the stream.

Anyone who stood out on his driveway with a hose and washed away debris could appreciate how the current would tend to smooth that off. So I inferred then that the current was not the main factor. I did see current right at the head of the Cumberland Island. And I think certainly that current is removing material that has fallen out of the bank of Cumberland Island.

Tr. 525–26.

Finally, counsel for defendant posed the ultimate question to Dr. Hagerty as follows:

Q. Sir, is this a proper point to ask you why the bank on the Smith property in Smithland has failed?

A. ... judging from the shape of the failure that I saw in the photographs and the other information that I have as to the displaced material and I heard Mr. Smith testify that he has drain pipes in the top of the bank that are four to six inches in diameter. *I think all of that is good evidence to suggest that piping is the mechanism for failure.*

Tr. 531 (emphasis added).

Moreover, if any erosive factors are occurring on the bank, Dr. Hagerty testified that they must be due to currents from the *Cumberland River.* Specifically, Dr. Hagerty stated that since the Cumberland Island channel is deeper than most of the Kentucky Chute, that is an indication that the flow of the Cumberland River is more powerful and erosive than the Ohio River.

When asked to summarize his conclusions as to the causes of the erosive problems to the plaintiff's Smithland property, Dr. Hagerty responded that "[w]ith respect to the left descending bank [of] Smith['s] property, the failures that I saw evidence of were not caused by scour or the tractive forces scouring effect of velocities, but it was an internal erosion mechanism in the upper part of the bank" (Tr. 539).[48]

*Conclusion*

The burden of proof by a preponderance of the evidence is on plaintiff herein to establish that it is more probable than not that the property damage (*i.e.,* .01 of an acre) he incurred on his fee interest was a direct and proximate cause of the construction of the Smithland Locks and Dam. Although the preponderance of the evidence standard is the least stringent burden to overcome in law, we are constrained to conclude that plaintiff has clearly failed to prove that the existence of the empirical factual findings compelled under his erosion theory are "more probable than its nonexistence." The testimony by Mr. Smith and, especially plaintiff's expert witness Dr. Morris, was patently weak and unimpressive. c/o *Quock Ting v. United States,* 140 U.S. 417, 420–21, 11 S.Ct. 733, 734, 35 L.Ed. 501 (1891). Specifically, Dr. Morris acknowledged—the faults and oversimplicity of his one-dimensional HEC 2 model; the fact that a two-dimensional model would undoubtedly have been more accurate; and the evidence of erosive factors occurring prior to the Smithland Dam project's construction. Furthermore, testimony by defendant's experts appeared to be more creditable in that it amplified the high probability of plausible alternative theories for the identified erosion, and provided further insights into the weakness of the HEC 2 model.

---

**48.** The testimony of both Dr. Hagerty and Mr. Lance (Tr. 422, 423) demonstrate the problems with plaintiff's HEC 2 model. In this connection, the following opinion testimony of Dr. Hagerty is probative:

Q. Suppose you were asked to do a HEC–2 study of this situation, how would you go about doing it?

A. Well, *I wouldn't* because the HEC–2 program is a very simplistic, one dimensional tool. We have very complicated divided flow over the island here. So if you get out the book that's been written with instructions on how to use this model and read it, *it says don't use it.*

Tr. 543 (emphasis added).

Accordingly, and in view of all of the foregoing, this court holds that (i) plaintiff possessed standing with respect to *only .01 of an acre* of the damaged fee property; (ii) plaintiff does not possess standing to bring a claim for preventative measures since we have ascertained that the James R. Smith Contracting Company, and not Mr. Smith personally, actually incurred the costs of erecting the preventative measures, and no evidence was adduced proving that Mr. Smith ever reimbursed the company; and (iii) plaintiff has failed to prove by a preponderance of the evidence that construction of the Smithland Locks and Dam was *the direct and proximate* cause of the erosion (.01 of an acre) which occurred on Mr. Smith's property.

In view of the judicial stipulation by the parties in open court that the damages stemming from the erosion to Cumberland Island were proximately caused by the Smithland Locks and Dam and the remnants of Shreve's Dike, the Clerk shall enter judgment accordingly, in favor of the plaintiff in the amount of $3,000, and, with respect to all of the other claims of plaintiff, the complaint shall be dismissed. No costs.

IT IS SO ORDERED.